(No. 42870.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JOHN HENRY GILL, Appellant.

*Opinion filed June 4, 1973.*

KENNETH L. GILLIS, Illinois Defender Project, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield (JAMES B. ZAGEL and JAYNE A. CARR, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

After a jury trial in the circuit court of St. Clair County, John Henry Gill was convicted on July 13, 1968, of the murders of two brothers, Thomas and Terry Morrissey, and upon the jury's recommendation was sentenced to death. On this appeal, he contends that the jury was improperly selected, that he was denied his constitutional right to the effective assistance of counsel, and that his conviction was the product of prejudicial materials brought out by the prosecutor in examining the victims' mother. Alternatively, he argued that in any event the death penalty was unconstitutionally imposed.

At about 6:30 on the morning of October 13, 1967, the bodies of Thomas Morrissey and his fourteen-year-old brother, Terry, were found in the auto-body shop operated by Thomas in East St. Louis, Illinois. Evidence offered at trial indicated that each of the victims had died from bullet wounds in the head inflicted sometime after 11:00 the previous evening.

A deputy sheriff of St. Clair County, Hosea Gines, testified that he lived next to the Morrissey shop, which is located approximately twelve blocks from the Hondo Lounge, a tavern. The witness stated that while driving in the vicinity of the lounge on his way to work he saw the defendant enter the Lounge between 11:00 P.M. and 11:30 P.M. on October 12, 1967. Gines testified that he stopped his car and followed the defendant into the tavern, because he had been informed by another police officer that the defendant was under suspicion of having committed an offense two weeks earlier, which was not identified.

The defendant was seated at the bar when the witness entered the lounge. After speaking with the owner for a few minutes, Gines observed the defendant get up as if to leave. Turning to the defendant, the witness asked him if he knew Gines's identity. The defendant answered yes, spoke Gines's name, and then shot him four times, firing through his trench coat. After the shooting the defendant pulled a small automatic pistol from his coat and ran out of the tavern. Based on his knowledge of weapons, Gines identified the weapon as a .25-caliber automatic.

Margaret Marie Moore, of East St. Louis, testified that the defendant twice came to her home in East St. Louis during the early hours of October 13, 1967, looking for her cousin, Barbara Gilmore, whom the defendant had formerly dated. The first time, which was between 12:30 A.M. and 1:00 A.M., he showed her a small pistol and jokingly asked if she wanted it for protection. He did not give the gun to her. The defendant also said that he had another gun, and she observed what appeared to be the butt of a pistol protruding from his pocket. The defendant returned to her house between 1:30 and 2:00 A.M., stayed for five or six minutes, and then left. He told her at this time that he had his brother's car.

The victims' mother, Mrs. Marie Morrissey, testified that she had seen her sons about 7:30 P.M. on October 12, 1967, when they left home for the shop. She last spoke to Thomas on the telephone at 11:00 P.M., when, she testified without objection, he told her that he and his brother were almost finished with their work and expected to be home soon. She then retired. The following morning she discovered the sons' beds had not been slept in and she later learned that they had been killed.

Albert Reid testified that he was working at a service station in East St. Louis on October 13, 1967, when the defendant, at about 1:00 A.M., purchased gasoline for a 1962 or 1963 Mercury, gold in color except for a blue right fender. At about 3:45 or 4:00 the same morning, the

defendant returned in the same car, purchased more gasoline and then ordered Reid at gunpoint into the driver's seat. The defendant forced the witness to drive along Route 40 to a ramp connecting with Interstate 70, which leads to Springfield. When they reached the ramp, the defendant ordered Reid out of the car. When Reid left the auto, he was shot by the defendant but he was able to run to a service station and employees there called the police. The witness reported the license number of the vehicle the defendant was driving to the Illinois State Police and the office of the sheriff of St. Clair County.

Gerald Campbell, an officer of the East St. Louis police force, testified that on the morning of October 13, 1967, he was on duty in a squad car with Patrolman Gerald Vardiman. They were directed by radio to proceed to the Morrissey body shop, where they were met by State Trooper Harry Burr. Looking through a window in the door of the shop, the officers observed that the lights were on and a body was lying on the floor.

Breaking a window in the door and entering the shop, they observed another body approximately three feet from the one they had observed. The officers then called the coroner. On the floor of the shop, they found three empty .25-caliber casings which were introduced into evidence by the People.

Clifford C. Kane, a physician and the coroner of St. Clair County, testified that when he arrived at the shop at 6:30 A.M. on October 13, 1967, the bodies were in a state of rigor mortis. An hour or two later that same morning, he conducted autopsies and found two bullet wounds in the head of Thomas Morrissey and three in the head of Terry. He testified that any one of the wounds would have been fatal. Dr. Kane also testified that one of the wounds in Thomas's head and two in Terry's were ringed with powder burns, which according to the witness indicated that "*** the gun would have been at close proximity to the head at the time it was fired ***."

State troopers William L. Sykes, James Merrifield, and Kenneth L. Decker testified to the circumstances surrounding the defendant's arrest. Officer Sykes testified that on the morning of October 13, 1967, between 6:30 and 7:00, he was patrolling an area near Springfield when he received two radio reports that a Negro man was wanted by the East St. Louis police in connection with the murder investigation. The man was reported to be driving a gold 1964 Mercury hardtop with a blue right front fender, bearing Illinois license number NT 1022. This matched the identification of the car which the defendant had forced Albert Reid to drive. There was evidence presented that the auto, though owned by Thomas Morrissey's mother, was actually used by Thomas, and that it was parked in front of the body shop on the night of the shootings.

Officer Sykes said further that at about 7:20 A.M. he observed the reported auto on Interstate 55 just north of Springfield proceeding in a northerly direction. Shortly after Sykes radioed this information to police headquarters, he observed the defendant pull into a service station. Officer Sykes entered the station at the same time as another trooper, James Merrifield.

The two officers placed the defendant under arrest. Trooper Merrifield testified that he searched the defendant and found a .38-caliber Smith and Weston pistol with four live rounds in his pocket. Other evidence offered by the prosecution showed the gun was registered in the name of James S. Anderson, a friend of Thomas Morrissey. Anderson testified that he had purchased the weapon for Thomas at his request and that Thomas kept it in the shop while working there, and on his person or in his home at other times.

Officers Sykes and Merrifield took the defendant to the Sangamon County jail, where he was questioned by Kenneth L. Decker, a trooper assigned to the Vehicle Investigation Section. Decker, who testified that he questioned the defendant solely in regard to the vehicle in

which he was arrested, said the defendant furnished him with two identification cards, one a selective service card bearing the name John Napoleon Russell and the other a selective service card in the name of Alvin Gill, Jr. The defendant told the officer, he said, that his name was Russell and that he had gotten the other card from a "buddy." The defendant told Decker that he had been walking along Interstate 55 in the vicinity of Springfield, when he saw the Mercury in a rest area with the keys in it. The defendant said that he got in the car and drove it off. He admitted to the officer that he had been in the East St. Louis area the preceding evening.

The defendant, however, testified that he had shot the Morrisseys and had stolen the auto. He also admitted shooting Hosea Gines in the Hondo Lounge, because, he said, he saw Gines begin to open his coat and thought Gines was reaching for a gun.

After shooting Gines, the defendant testified, he ran from the lounge and began to run through nearby alleys. As he was running through one of the alleys, he said, Thomas Morrissey pointed a pistol at him and ordered him into the body shop. Then according to his testimony the Morrisseys "*** started making a lot of statements about colored moving out in the neighborhood"; they also "asked [him] did [he] know any girls," and then the Morrisseys together with the defendant smoked some marijuana which the defendant furnished. The defendant testified that he repeatedly asked the victims if he could leave, and that they repeatedly told him he would have to remain a little longer. Finally, he testified he became extremely frightened, "and *** I run my hand back down in my pocket, knocked the safety off the pistol, and I said, can I go, and he [the elder Morrissey] said, not yet, and that is when I started shooting." After taking Thomas Morrissey's pistol, the defendant took the Morrissey car, which, he testified, had its key in the ignition. He testified that he had twice visited Margaret Moore as she had related

and he admitted that he had forced Albert Reid at gunpoint to drive him to the ramp connecting with Interstate 70, where he shot Reid.

In the course of his direct examination the defendant also stated that he had shot Lester Pierce, apparently on the morning of October 12, 1967. The circumstances of this are not clear. The defendant testified he shot Pierce "Because he was talking about putting me out of the house, and I told him he wasn't going to put me any way, and he broke in the bedroom and come back out with a rifle."

On this appeal the defendant first contends that the trial court erred in denying his motion to discharge the jury panel on the ground that the panel was improperly selected. The contention is not supportable.

Section 114—3(a) of the Code of Criminal Procedure (Ill. Rev. Stat. 1965, ch. 38, par. 114—3(a)) outlines the procedures to be followed in challenging the manner in which a jury has been selected:

> "(a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the voir dire examination. For good cause shown the court may entertain the motion after the voir dire has begun but such motion shall not be heard after a jury has been sworn to hear the cause."

The record shows that the defendant did not make any challenge to the panel's selection until after the jury had been sworn. The trial court did not err in denying the motion.

The second claim of the defendant is that the representation given at trial by his appointed attorney was inadequate.

In discussing the inadequacy of the legal representation given an accused we have said: "Before a conclusion of inadequate representation can be reached the defendant must demonstrate the actual incompetence of counsel as reflected by the manner of carrying out his duties as a trial

attorney and it must further appear that substantial prejudice results therefrom, without which the outcome would probably have been different. [Citations.] " (*People v. Harper, 43 Ill.2d 368, 374.*) Too, it has been observed that "Matters going to the exercise of judgment and discretion and trial tactics are insufficient to establish the incompetence of counsel." *People v. Newell, 48 Ill.2d 382, 387.*

We shall consider what we deem to be the more important of the number of criticisms directed at the representation.

One of these is that the attorney in his final argument made remarks that were equivalent to a confession of guilt. Parts of his argument were "John Henry Gill did not mutilate these boys' bodies, he killed them but he didn't mutilate them, cut them up, throw them away. He didn't strangle them to death. He didn't torture them. They died instantly, both of them. If they had to die, at least it was merciful. *** [N]othing that I can say to you or John Henry Gill can justify what happened ***. I don't think I can sit here and try to negate to you every element of the crime of murder ***. The death penalty is not the only proper punishment for John Henry Gill."

We must judge the remarks in their setting and against the background of the overwhelming evidence that had been given the jury of the defendant's guilt. The evidence was of a violent criminal rampage, which numbered among its victims a fourteen-year-old boy. The prosecution had called upon the jury to return a death penalty in this case, which must have been a *cause celebre* in the community. The attorney could not controvert the evidence; he could not change it; his case was professionally desperate. It is not unreasonable to consider he felt he could only hope to persuade the jury not to recommend the death of his client. That this motivated the remarks he made is illustrated, we believe, by his plea that "The death penalty is not the only proper punishment for John Henry Gill."

We cannot say from this cool and distant station some years later that the argument of counsel showed professional incompetence.

Another claimed instance of the attorney's incompetence is that he was not diligent in that he failed to obtain a copy of the coroner's protocol until immediately prior to the coroner's testifying. It is argued that "[t] he failure of defense counsel to obtain a copy of the coroner's autopsy report prior to trial demonstrated a basic lack of preparation on the part of defense counsel." The record however does not support such a conclusion. The record shows that prior to trial the defendant made a comprehensive 27-point discovery motion, which included the request: "Whether or not a postmortem or autopsy was performed on the victim. If so, the time and place where performed, the names and addresses of the persons who performed such procedure and the results of such procedure." Over the objection of the prosecution the trial court ordered the People to provide a certified copy of the transcript of the proceedings conducted by the coroner of St. Clair County at the inquests into the deaths of the Morrissey brothers. The prosecution provided the defense attorney with the coroner's protocol only shortly before the coroner was to testify. Before the coroner took the stand, the defendant's attorney asked that the coroner be barred from testifying, and he informed the court that he had communicated with both the prosecutor and the coroner in vain attempts to obtain the report before the commencement of trial. The prosecutor, however, told the trial court that he had seen the protocol only moments before the defendant made his motion to bar the testimony of the coroner. The record does not explain the delay in the prosecutor's obtaining the report. The trial court, at the prosecutor's suggestion, recessed the trial so that the defendant's attorney would have an opportunity to examine the protocol and interview the coroner prior to his testifying. The complaint against the attorney must be regarded as unfounded.

Another criticism of trial counsel is that he neglected to develop a suggestion by a court-appointed psychiatrist, Dr. Frank Perez, that the defendant was unable to "conform his conduct to the requirements of law."

On the motion of the defendant's attorney a jury hearing prior to trial was had on the question whether the defendant could "understand the nature and purpose of the proceedings against him and assist in his own defense." Dr. Perez was appointed by the court to examine the defendant, and after his examination Dr. Perez expressed his opinion that the defendant was able to stand trial. His report stated in part:

> "Two factors should be taken into consideration; one the alcohol which always liberates repressed feelings, and the other the recent return to society. Individuals who are in a repressed environment, require time before they are decompressed. His basic and primitive nature all of a sudden allowed outside revealed in this moment the depth of his desperation and rage which exploded. However, from previous evidence, it was obvious that for many years this inmate has been exhibiting his almost naked maladjustment from which there was very little change and the little that there was was under conditions of external controls."

The defendant now urges that Dr. Perez's report suggested that the defendant has lost his ability to control his conduct and that the trial attorney failed to develop this avenue of defense.

However, the record shows that Dr. Perez was called as a defense witness at trial and that he was closely examined by the defendant's attorney regarding the defendant's capacity to "conform his conduct to the requirements of law." The attorney directed the psychiatrist's attention to the section of his quoted report but the response of the psychiatrist was that he did not intend by those remarks to express a conclusion that the defendant had lost all capacity to conform his conduct to what the law required. He said that at most the defendant had "*** a moment of what is called partial responsibility, not

total loss of responsibility." Thus the record shows that despite defense counsel's attempt to elicit a favorable statement the witness was unable to say that the defendant had lost his capacity to conform his conduct to legal requirements.

In another complaint against the legal representation he received the defendant criticizes counsel for bringing out in the defendant's testimony his juvenile record and record of misdemeanors, for bringing out through the defendant's testimony that he had shot two others besides Hosea Gines and the Morrisseys. He complains, too, of the attorney's eliciting testimony from the defendant's mother as to the extremely poor home environment the defendant had as a boy.

Under other circumstances the attorney's conduct well might unquestionably be criticized, but the circumstances under which the attorney operated after the State's presentation of evidence were exceptional. The attorney was struggling to avoid the imposition of the death penalty in a case shown to involve extraordinary criminal conduct, including the evidence of two wanton murders, one of a 14-year-old boy. Too, the evidence complained of was brought out prior to the testimony of Dr. Perez and may have been calculated to be joined with the testimony of Dr. Perez on the question of the defendant's ability to "conform his conduct to the requirements of law." But we judge that we need not formally consider whether the attorney's tactics in this constituted incompetence in representation. As we have observed, in order to warrant the reversal of a conviction on grounds of inadequacy of representation the defendant must demonstrate the actual incompetence of counsel in carrying out his duties and, in addition, it must appear that "substantial prejudice results therefrom, without which the outcome would probably have been different." (*People v. Harper, 43 Ill.2d 368, 374.*) Considering the entire record here, even if one would assume serious deficiencies in the representation, it cannot

be said that the outcome without them "would probably have been different." *People v. Harper, 43 Ill.2d 368, 374.*

The last contention of error concerns testimony which was given by the mother of the murder victims without objection on the part of the defendant's attorney, which it is said was highly prejudicial.

Mrs. Marie Morrissey was called apparently as a "life and death" witness and also to identify the automobile that her son Thomas drove and the fact that he owned a pistol. However, the prosecution brought out from the witness *inter alia* the ages of the Morrissey children, their educational backgrounds and employment and other testimony that was irrelevant and objectionable. The defendant argues that the prejudice to the defendant through this testimony was so manifest and so substantial that we should not apply the customary rule that a failure to object to the admission of evidence at trial will preclude any complaint on appeal. Alternatively, the defendant argues that trial counsel's failure to object was convincing evidence of the inadequacy of his representation.

There is no doubt that much of the testimony of Mrs. Morrissey was irrelevant and improper and should not have been elicited or admitted. Were the death penalty not to be prohibited here on other grounds the case for reversal because of the admission of this evidence would be more forceful. In *People v. Bernette, 30 Ill.2d 359,* at 372, upon which the defendant relies in this argument, we reversed a murder conviction where highly prejudicial evidence was admitted, saying: "What part this inflammatory appeal to the jury played in the selection of the death penalty cannot be known." But considering that punishment of death imposed here cannot be enforced because of the decisions of the Supreme Court in *Moore v. Illinois, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562,* and *Furman v. Georgia, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,* and considering the evidence of guilt, reversal would not be appropriate. Even if the error in the admission of this

evidence is to be deemed of constitutional proportions, in view of the fact that the evidence of the defendant's guilt was overwhelming we are able to declare our belief that the admission of the evidence concerned was harmless beyond a reasonable doubt. *Chapman v. California, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.*

Accordingly, the judgment of conviction is affirmed, but since the sentence of death may not be imposed under the decisions in *Moore v. Illinois* and *Furman v. Georgia,* that sentence is vacated and the cause is remanded to the circuit court of St. Clair County for the imposition of a sentence other than death. *People v. Speck, 52 Ill.2d 284; People v. Newbury, 53 Ill.2d 229, 242.*

*Affirmed and remanded, with directions.*