THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEROME JACKSON, Defendant-Appellant.

First District (4th Division)    No. 78-1025

Opinion filed December 20, 1979.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Jerome Jackson, was charged by indictment with armed robbery. He was tried by a jury, found guilty, and sentenced to 5 to 15 years in the Department of Corrections. On appeal the defendant argues that (1) the State failed to prove his guilt beyond a reasonable doubt; (2) he was denied a fair trial in that the State was permitted to impeach his testimony with a prior misdemeanor theft conviction; (3) the court committed reversible error in refusing to allow him to cross-examine a witness regarding a prior inconsistent statement; (4) his constitutional right to effective assistance of counsel was violated in that defense counsel failed to conduct an appropriate investigation of his defense, failed to object to evidence of an unrelated offense committed by a co-indictee, and failed to object when the State misstated the law to the jury during closing argument; and (5) the sentence of 5 to 15 years should be reduced.

At trial, Rose Cain testified that on June 8, 1976, she was employed as manager and sales clerk at Tri-American Oil Company in Markham, which is a gas station and convenience store. At about 9 p.m., as the station was about to close, two black males robbed the station. One man had a gun. The attendant and two customers were told to lie on the floor in the back and the manager was directed to empty all the cash from the register into a paper bag and to give the robbers lottery tickets. One man collected the wallets of the persons in the store and placed them in Cain's purse. The robbers left with about $450 in bills, rolled coin, and loose coin,

cigarettes, a bottle of wine and receipts in a brown manila envelope. Cain identified a manila envelope containing receipts, a register tape, and a shift inventory as items taken during the armed robbery.

A few minutes after the robbers had left the manager reported the robbery to the Markham police. She described the robbers as two black males in their early 20's, one wearing a pin stripe suit and one wearing a hat. She told the police that the gas station attendant described the car as a dark green Oldsmobile.

Clarence Simmons, a police officer for the City of Markham, testified that at 9 p.m., on June 8, 1976, he received a radio message of an armed robbery at Tri-American Oil Company. At the time he heard the radio message Officer Simmons was approximately 175 to 200 feet away from the gas station. He observed two black males entering a dark green car parked behind the gas station. After entering the car, the occupants drove away from the station. Simmons followed the car.

Officer Simmons. was driving alone in an unmarked vehicle. He observed three people in the car. The defendant was driving. Simmons observed that all three occupants of the car took turns sipping from a bottle of wine. At one point, Officer Simmons pulled adjacent to the vehicle and the defendant and officer exchanged black power signals. The officer also saw the defendant kiss an amount of currency and then make gestures to the other passengers which Simmons described as "an indication of exchanging five."

As the vehicles approached 80th Street on the Dan Ryan Expressway, the officer attempted to curb the other vehicle. He placed a magnetic red light on top of his car and hit a switch that alternated his headlights. The car which the defendant was driving made an exact right hand turn and went across three lanes of traffic in an attempt to make the 79th Street exit. The car crashed into a light post and three persons exited the vehicle and proceeded up the ramp on foot.

After curbing his car, Officer Simmons announced that he was a police officer. Danny Creer, one of the defendant's companions, then turned and fired three shots from an automatic handgun. Officer Simmons was unable to return the fire because there were spectators along the ramp.

With the help of two off-duty Chicago Policemen Officer Simmons arrested the defendant. The officer had chased the defendant for 1½ blocks before he caught him. Officer Simmons testified that he found $433 in United States currency and receipts from Tri-American Oil Company on the defendant's person. Recovered from the green Oldsmobile were a brown manila envelope, charge receipts, $37.30 in coins, and a bottle of wine.

A statement the defendant gave to Officer Simmons at the Markham

police station was read into the record. In this statement the defendant stated that he was a passenger in Nelson Langdon's car because Langdon had taken the defendant to see a friend. Danny Creer, a friend of Langdon's, was also a passenger. Langdon drove to the gas station to buy cigarettes and Langdon and Creer went inside. When they came out they ran back to the car and the defendant saw that Creer was carrying a gun and money bags. Langdon drove the car away from the station. The defendant began driving after the car reached the expressway and his companion told him to do so. After the officer told them to stop, Langdon grabbed the wheel causing the car to crash into a pole near the 79th Street exit.

Officer Simmons testified that at no time did the occupants of the car exchange drivers. He also testified that he did not see Langdon grab the steering wheel from the defendant.

The defendant was called as a witness on his own behalf. He stated that at the time of the robbery he was working for Amtrak and had worked there for approximately two years. On the day of the robbery, the defendant met Langdon and Creer at Langdon's house so that Langdon could drive the defendant to his aunt's house to discuss the purchase of a car. The aunt's house was in the vicinity of the gas station.

After visiting the aunt's home, at approximately 9 p.m., Langdon drove to the gas station. Langdon and Creer went in to buy cigarettes. The defendant testified that he remained in the car sitting on the passenger's side wondering what was taking his companions so long to buy cigarettes. As the defendant got out of the car, he saw Langdon and Creer running toward him. Creer was carrying a gun and Langdon had money bags and some envelopes. The defendant testified that contrary to what Officer Simmons had stated, Langdon got behind the steering wheel and Creer got into the back seat.

The defendant testified that when they reached the expressway he was told to drive because Langdon was driving recklessly. When he refused, Creer pointed a gun at the defendant and insisted he drive. The defendant got behind the wheel and started to drive. He denied that he kissed money or gave a clenched fist sign. He testified that he drank nothing.

As they approached the 79th Street exit the Chicago police came behind them and told them to pull over. Langdon grabbed the steering wheel and they hit a lamp post on the ramp. They jumped out of the car. Langdon and Creer ran but Jackson did not. A fireman and a Chicago police officer on a motorcycle told the defendant to lie down. They searched him and he said he had done nothing. Thereafter, Officer Simmons arrived, showed his badge, and said he wanted to take Jackson back to Harvey.

The defendant testified that in the statement he gave at the Markham police station he did not mention that Creer had threatened him with a gun because he felt that Creer was in enough trouble.

The defendant testified that on May 26, 1976, he made a $500 withdrawal from his credit union. The purpose of the withdrawal was to purchase a car. To support this contention, the defendant attempted to introduce a copy of the record of his account at the credit union. The People objected to any further use of the exhibit because it had not been disclosed pursuant to discovery, and because its admission would violate the best evidence rule. The court subsequently conducted a hearing on the exhibit outside the presence of the jury.

The State withdrew its objections and put the defense on notice that it would argue to the jury that the credit union record was a forgery. It would base its argument upon the similarity of the handwritten name of Jackson on the card, and the admitted signature of Jackson on his bail bond slip.

The defendant testified that he had lost his passbook and never obtained a replacement. The credit union had the original document. He testified that neither he nor his attorney had attempted to subpoena the original record. He denied that he had obtained someone else's passbook, xeroxed it, and filled in the top with his own name and address.

In rebuttal, the State introduced the bond slip with the defendant's signature, and a certified copy of Jackson's conviction for petty theft in July 1979.

During his closing argument the prosecuting attorney indicated that he was going to define accountability. Defense counsel objected and the court ruled that as long as the People's statement kept within the definition stated in the instructions that the objection would not be sustained. The State presented a definition of accountability and then stated:

> "If you would think or reflect on that meaning [of accountability] you will recall the getaway after the robbery, and you may ask yourself is getting away part and parcel of a particular crime and the answer is, 'yes.'
>
> If an act is committed, being armed robbery, obviously you couldn't stay there. That wouldn't make any sense. They had to get away and actually the actual aidor [sic] part of the complaint entails getting away and because of quick Police work they weren't able to get too far."

The defendant's attorney did not object further during this portion of the closing argument.

Later during the State's closing argument the following colloquy occurred:

"MR. ARTHUR [Assistant State's Attorney]: Maybe it is interesting enough to listen to an armed robbery, but you have seen forgery concerning the signature signed here a year and a half ago on a bond slip and the statement to the Police.

Okay. You're going to find a little different things here and there. Take a good look at it, because I think we proved forgery in this case as well as armed robbery.

MR. MORRIS [Defense Counsel]: Objection.

THE COURT: Let's not get carried away."

The jury returned a verdict of guilty and thereafter a sentencing hearing was conducted. The defendant's attorney noted that the sentencing judge had also sentenced Nelson Langdon. He reminded the court that although Langdon had attempted "busting out of this place" that the State had recommended and the court had imposed a sentence of five to seven years. Various mitigating factors were presented to the court.

Among other aggravating factors presented, the State noted that Jackson "had gone down before on a similar offense, a robbery reduced to theft." The court inquired of Jackson whether the theft conviction was a plea of guilty and he stated that it was. The Assistant State's Attorney also pointed out that unlike the defendant, Langdon had never been arrested previously and that he had "admitted his part in his crime instead of lying to a jury."

In sentencing Jackson, the court stated that it was considering in aggravation the fact that Creer had shot at Officer Simmons although this factor was "offset somewhat" by the fact that the defendant did not pull the trigger. Also considered in aggravation was the fact that the defendant's driving had endangered many people. The court noted that the defendant had "one prior record from 1969 of a similar offense but reduced to theft and the conviction is for theft."

The defendant first asserts that the evidence against him was circumstantial and that therefore, the facts proved must exclude every reasonable hypothesis of innocence. Our supreme court recently discussed the use of circumstantial evidence in criminal cases. Quoting from *People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804, the court in *People v. Fletcher* (1978), 72 Ill. 2d 66, 71, 377 N.E.2d 809, 812, stated:

" 'We find apposite here the statement in *People v. Marino*, 44 Ill. 2d 562, 580, that "it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People v. Bernette*, 30 Ill. 2d 359, 367, 'a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People v. Russell*, 17 Ill. 2d 328,) it being necessary only

that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi,* 9 Ill. 2d 169; *People v. Grizzel* 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' " Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Hanson,* 59 Ill. 266; *People v. Branion,* 47 Ill. 2d 70.)" Illinois courts have also noted that the proposition that circumstantial evidence relied upon must not give rise to a reasonable hypothesis of innocence does not mean that the trier of fact is required to search out a series of potential explanations compatible with innocence and to elevate them to the status of reasonable doubt. *People v. Huff* (1963), 29 Ill. 2d 315, 194 N.E.2d 230; *People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926.

In the instant case the State's witnesses testified that after the robbery the two robbers entered the car and that the defendant then drove the car away from the gas station. The police officer testified that he followed the car from the time it left the station until it hit the light pole and that he arrested the defendant immediately thereafter. While following the car the officer did not see the occupants switch drivers but did see the defendant kissing money and drinking wine. Wine and money were items taken during the robbery. The officer testified that the defendant took evasive action when the police tried to curb the car he was driving, fled with the passengers after the car hit a light pole, and when caught, was found to have on his person $433 and charge receipts from the gas station which had been robbed.

■■ Recognizing that it is the function of the jury to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6), we conclude that the facts proved not only established the defendant's guilt beyond a reasonable doubt, but that they were also inconsistent with any reasonable hypothesis of innocence.

The defendant next contends that he was denied a fair trial in that the State was permitted to impeach his testimony with a prior misdemeanor theft conviction. He argues that misdemeanor theft does not involve "dishonesty or false statement" or alternatively that the probative value of the prior conviction on the issue of his credibility is outweighed by the prejudicial effect.

The defendant's first argument was specifically rejected by the

Illinois Supreme Court in *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563. The court held that under proposed Federal Rule 609(a)(2), adopted in Illinois in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, a prior misdemeanor theft conviction is admissible for purposes of impeachment. The court wrote:

> "There is little doubt but that theft reflects adversely on one's honesty and therefore relates to one's ability to be truthful under oath. [Citation.] * * * Reason compels the conclusion that a conviction for theft, petty or grand, should be admissible to impeach, due to the relation it bears to testimonial deceit." *Spates*, 77 Ill. 2d 193, 204, 395 N.E.2d 563, 569.

The *Spates* court specifically stated that the rule remains that it is the province of the trial court to weigh the probative value of a conviction for misdemeanor theft against the potential for unfair prejudice which might result and, in the appropriate case, refuse to admit evidence of a conviction. The various factors to be considered are: the nature of the crime, the nearness or remoteness in time of the conviction to the present trial, the subsequent career of the person, and whether the crime was similar to the one charged. *People v. Montgomery* (1971), 47 Ill. 2d 510, 518, 268 N.E.2d 695, 700.

■ Considering the foregoing factors in the instant case, we conclude that the trial court did not abuse its discretion in permitting the State to introduce the certified statement of a prior misdemeanor theft conviction for purposes of impeachment.

The defendant next contends that the trial court committed reversible error in refusing to allow him to cross-examine a witness regarding a prior inconsistent statement. He argues that a proper foundation was laid for establishing that by failing to assert in his police report that he had found receipts on the defendant's person where it would have been natural for him to do so, the police officer had in effect asserted that he had not found receipts on the defendant's person.

■ While the defendant's assertion that the trial court erred in not permitting him to impeach the witness with the prior inconsistent statement is correct, it does not follow that the cause should therefore be reversed. From the record before us it is impossible to determine whether the error resulted in any prejudice to the defendant.

The police report is not a part of the record. Therefore, it is not known whether the police report does, as defendant contends, omit any reference to finding receipts on defendant's person. On the contrary, the police report may corroborate the testimony of the officer by indicating that he did find such receipts.

The defendant's fourth claim is that his attorney failed to provide him with effective representation and that as such he was denied his

constitutionally guaranteed right to counsel. He asserts that his attorney was incompetent because he should have subpoenaed the original of his credit union documents; should have produced an expert handwriting witness to refute the inference of forgery; should have called Langdon as a witness because his counsel allegedly had a copy of a confession by Langdon which stated that Langdon and Creer had split the robbery proceeds; should have objected to the allegedly inadmissible testimony of Officer Simmons that he was fired upon by Creer; and should have objected to the State's alleged misstatement of the law made during closing argument.

In Illinois a strict test is applied in determining the competency of privately retained counsel:

> " 'In such a case the court will not reverse a conviction because of the incompetency of counsel unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' " (*People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677, 685.)

Errors in judgment and trial strategy do not establish incompetency (*Murphy*, and cases cited therein), and, to reverse on the ground of incompetency of counsel, the defendant must establish that substantial prejudice resulted therefrom. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3; *People v. Gill* (1973), 54 Ill. 2d 357, 297 N.E.2d 135, *cert. denied* (1974), 414 U.S. 1144, 39 L. Ed. 2d 100, 94 S. Ct. 897.) Further, a claim of prejudice resulting from alleged incompetent counsel cannot be based upon mere conjecture. *People v. Lewis* (1975), 60 Ill. 2d 152, 330 N.E.2d 857; *People v. Williams* (1974), 59 Ill. 2d 402, 320 N.E.2d 849.

Many of the examples of incompetency cited by the defendant were matters of judgment and trial strategy. The decision not to object to Officer Simmons' testimony that he was shot at by Creer, for example, may have been due to the defense attorney's judgment that the value of such objection to his client's case was outweighed by the risk of engendering the distrust and irritation of the jury. The same is true for the defense attorney's decision not to continue to object to the prosecutor's alleged improper definition of accountability. The defendant's attorney may have determined, as a matter of trial strategy, that to forego further objections was especially appropriate as the jury would be admonished to apply the definition contained in a written instruction which both attorneys had agreed to. The decision whether to call Langdon, an admitted perpetrator of the robbery and alleged co-criminal, was clearly a matter of judgment. The defense attorney may have determined that the value of any favorable testimony from such a witness was questionable and that Langdon's testimony might have damaged the defendant's credibility or standing in the eyes of the jury.

The defendant also tries to show incompetency based upon the defense attorney's failure to offer certain proof that the defendant did make the credit union withdrawal and did not forge the copy of the credit union record. This argument is based upon speculation by the defendant that the withdrawal was made and that the copy was not written in the defendant's hand. These assumptions are not supported by the record.

■ It is evident from the report of the proceedings that the defense attorney represented the defendant vigorously. Prior to trial he moved to suppress the defendant's confession, to dismiss the charge for violation of constitutional rights, and for severance. He conducted extensive discovery. At trial, he cross-examined the People's witnesses at great length and made objections during direct examination and during argument. His opening and closing statements were appropriate. The claimed errors asserted by the defendant, whether considered singly or cumulatively, do not support his contention that his legal representation amounted to no representation at all or that the trial was reduced to a sham or farce.

Defendant next contends that the "gross disparity" between his sentence and that received by a co-indictee who pleaded guilty indicated that he was penalized for exercising his right to a jury trial. The defendant was sentenced to 5 to 15 years in prison while the co-indictee received a sentence of 5 to 7 years.

■ Although it is unconstitutional to impose a harsher sentence as punishment for exercising the right to trial by jury (*People v. Moriarty* (1962), 25 Ill. 2d 565, 185 N.E.2d 688), a disparity between sentences imposed upon a defendant who stands trial and his accomplice who pleads guilty does not of itself establish that the former was penalized for exercising his right to a jury trial. (*People v. Martin* (1970), 47 Ill. 2d 331, 265 N.E.2d 685; *People v. Hayes* (1978), 62 Ill. App. 3d 360, 378 N.E.2d 1212.) Rather, it is the reason for the disparity that is controlling (*Martin*; *Hayes*), and the assertion that the sentence was imposed because defendant demanded a jury trial must be clearly established by the evidence. *People v. Sivels* (1975), 60 Ill. 2d 102, 324 N.E.2d 422.

In the instant case no such improper basis for the disparate sentences has been established. Rather, a reading of the record indicates that the opposite is true. The trial court expressly stated:

"I certainly don't want it to be thought, and I'll make this quite manifest at this time, that this court does not punish people for exercising their right to a jury.

I think if I considered that, the fact that he took a jury trial as grounds to raise his sentence, I think this would have a chilling effect on a person's right to trial by jury and so I see no basis to fault him and I want that perfectly clear for the record.

I do not punish people who take jury trials by reason of their having taken a jury trial."

■■ Further, one of the aggravating factors presented by the State was that the defendant, unlike the co-indictee, took the stand and lied. Such a factor can be relevant to a defendant's rehabilitative potential (*People v. Jones* (1972), 52 Ill. 2d 247, 287 N.E.2d 680; *Hayes*), and differences in rehabilitative potential are a proper basis for disparate sentences. (See *People v. Hancock* (1978), 65 Ill. App. 3d 694, 382 N.E.2d 677; *People v. Broom* (1977), 48 Ill. App. 3d 994, 363 N.E.2d 635.) Our supreme court has also indicated that although one cannot be penalized for having chosen to go to trial, dispositional concessions may be made by a court to a defendant who pleads guilty. See *Sivels*, 60 Ill. 2d 102, 104-06, quoting the A.B.A. Project on Minimum Standards for Criminal Justice (Standards Relating to Pleas of Guilty §1.8).

■■ The defendant's contentions that his sentence must be reduced because the court considered that his prior misdemeanor theft conviction had been reduced from a charge of robbery and that Creer had shot at Officer Simmons are also without merit. The imposition of a sentence is discretionary with the trial court and absent abuse of this discretion the sentence of the trial court will not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Although the defendant may not be, in the literal sense, "constructively chargeable" for the shooting, and, although the trial court used this language, it was not improper for the trial court to consider the fact that a police officer was shot at while attempting to apprehend the perpetrators of the crime for which the defendant has been convicted. Considering this evidence was not error especially since it had been introduced at trial. Similarly, we will not find an abuse of the court's discretion merely because the court stated that: "The defendant has one prior record from 1969 of a similar offense reduced to theft and the conviction is for theft."

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.