(No. 45749.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. A. J. GANT, Appellee.

*Opinion filed September 27, 1974.*

William J. Scott, Attorney General, of Springfield, and James R. Burgess, Jr., State's Attorney, of Urbana (James B. Zagel, Assistant Attorney General, and Robert James Steigmann, Assistant State's Attorney, and Keith Luymes, John W. Howard, and Genaro Lara (Senior Law Students), of counsel), for appellant.

John F. McNichols, Illinois Defender Project, of Springfield (Bruce L. Herr, Staff Attorney, of counsel), for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

A. J. Gant was charged by the Champaign County grand jury in a six-count indictment with attempted murder, two counts of aggravated battery, burglary, and two counts of armed violence. The trial court struck count I, charging attempted murder, count IV, charging burglary, and count V, charging armed violence. A jury returned verdicts of not guilty on both aggravated-battery charges, counts II and III, but guilty of the included offense of battery, and guilty on count VI, the remaining armed-violence charge. Defendant was sentenced to concurrent terms of 2 to 10 years imprisonment on the armed-violence conviction and 5 months on the battery, with 5 months credit on each sentence for time spent in jail.

An appeal to the Appellate Court for the Fourth Judicial District resulted in reversal of the judgments and remandment for a new trial. (9 Ill. App. 3d 774.) We allowed the State's petition for leave to appeal.

The 24-year-old defendant and 20-year-old Mary Ward had been "going together" for some four years during which, as defendant put it, they had "had their ups and downs." Defendant was the father of Mary's baby. On the evening of August 12, 1970, when the offenses were committed, Mary and the baby were at the home of her parents, who apparently disapproved of her relationship with Gant, since the father testified he had earlier ordered him to stay away from the parents' home. Mary and the baby were sitting on the couch in the living room, the mother was sitting in a chair in front of or near the door, and Mary's 14-year-old brother, Jerry, was in the room. All were watching television. The inner front door was standing open, but the aluminum frame screen door was locked.

Beatrice Ward, Mary's mother, testified that defendant came to the door and asked if he could come in. She told him "no," saw he had a double-barreled, sawed-off

shotgun pointed at her and stated he said "Go get your gun, we're going to shoot it out [an apparent reference to a pistol owned by Beatrice Ward]. I'll kill you." She further testified that she grabbed her purse and ran to her room and called the police and that while in the other room she heard her daughter say "Don't shoot my baby," after which she heard a shot. Mrs. Ward also testified she heard the door break open, and she identified pictures of the hole in the couch and marks on the wall made by the pellets from the gun.

Jerry Ward testified that he was sitting "on the arm of a chair by my mother, which was by the door, the front door," watching television when defendant came to the door, asked whether Mary was there, was told she was not, requested and was denied permission to enter, and then "snatched open the screen door" and came in carrying a gun that "looked like a shotgun." Jerry Ward further stated that he then ran out of the back door and to the next-door neighbor's from where he heard a shot fired. He corroborated his mother's testimony as to the statements made to her by Gant, as well as her testimony that she reached for something, although Jerry Ward described it as a paper bag the contents of which he did not know.

Two Urbana police officers, Russell Brown and Everett Krueger, who responded to the call testified they received it at 8:54 p.m., arrived at the house about three minutes later and found Mary Ward lying on the floor in front of the couch, unconscious and bleeding from the head. An ambulance was called to take her to the hospital. The officers found the door handle, which had been torn off, on the floor and an unfired shotgun shell in a flower bed or box outside the front door. Officer Brown also testified as to a conversation he had with Mary Ward about 9:30 that evening in the hospital emergency room in the presence of Officer Krueger and two nurses. The substance of his testimony was that in response to a request to tell them what had happened Mary Ward said "A. J." had

come to the door, asked for her and "busted" the locked door open after her mother ran out of the room; that Mary had told Gant "Don't shoot, you'll kill the baby," that she said the gun was a 12-gauge double-barrel shotgun she had seen him with before, and that she fell to the floor after the shot and "wasn't clear on everything then."

Defendant's motion for a mistrial because the prejudicial nature of this testimony was so great that no instruction limiting it to purposes of impeachment could produce a fair trial was then denied, the court indicating a limiting instruction would be given the jury at the close of the case.

Dr. James E. Keasling testified, over defendant's objection, that he had been called to treat Mary Ward at the hospital emergency unit and found that she had a deep laceration on the right side of her scalp; that he cleansed, trimmed and closed it using five large sutures, and admitted her to the hospital for overnight observation. He further testified that, although informed initially that the patient had a gunshot wound, it was not, in his opinion, such a wound but, rather, one caused by a semi-sharp, hard, blunt instrument; that, in order "that I might have a better understanding of the wound problem" he inquired of the patient as to what had happened. Mary Ward then, he testified, said "she was sitting on the couch when a man entered the room behind her, threatened her, and apparently something hit her on the head, and at the same time a gun went off." The doctor also stated that Mary Ward said she knew the individual. At the conclusion of the testimony regarding this conversation, the trial judge instructed the jury that it was admitted for purposes of impeachment and not as substantive evidence.

Immediately prior to the selection of a jury the State had requested that the court order Mary Ward to remain at the courthouse that day and return the next morning. Her answers to the questions then asked her by the judge indicated her intention not to testify in response to the

subpoena previously served on her, giving as her reason that she loved the defendant. When later called as a witness by the State and asked where she had been on August 12, she responded that she did not recall, and when asked whether anything unusual happened to her during the month of August, she answered: "I plead to the Fifth Amendment." The State then moved to grant and the trial court granted her immunity from prosecution, for "anything that she may testify to." Further questioning resulted in statements that "when they said somebody was coming in the door I put my head down because I—that's when they said gun, so I just put my head down." She also testified she was hit on the head and heard a "gun noise" at the same time, blacking out when she was struck. She was asked, without objection, about her subsequent conversation with the police at the hospital, said she told them that she had said "Don't shoot my baby," and denied stating to the police that A. J. Gant had shot her but later stated that she "might have told the police anything, because I wasn't in my right mind then." She further testified she saw her mother run to her room and her brother run out of the room, and that she told the police her mother said the gun was a 12-gauge double-barreled, sawed-off shotgun, but denied seeing it herself. She also stated she had been at a friend's house earlier that day, that A. J. Gant had come there and she had hidden from him because "I thought he might try to do something to me." On cross-examination she denied any fear of defendant, stating again that she loved and wanted to marry him, and that she did not want to see defendant on trial or in jail.

The appellate court apparently felt compelled by language in earlier opinions of this court (*People v. McKee* (1968), 39 Ill.2d 265; *People v. Tunstall* (1959), 17 Ill.2d 160, and *People v. Hundley* (1954), 4 Ill.2d 244) to hold that Mary Ward's statements to the doctor and the police were clearly hearsay and, since they bore directly on

defendant's guilt or innocence, were incompetent, even for impeachment purposes, because of their prejudicial nature.

The State in its petition for leave to appeal and in its brief and argument here focuses upon the desirability of changing our rule so as to permit the use of prior, inconsistent statements as substantive proof instead of continuing to limit their use to purposes of impeachment. We thoroughly considered the argument favoring such change in *People v. Collins* (1971), 49 Ill.2d 179, and there expressed our unwillingness at that time "upon the basis of the experience and opinion presently available, to adopt a rule which permits the substantive use of prior out-of-court statements of witnesses." (*Collins* at 198.) Since adoption of that opinion we reaffirmed it in *People v. Powell* (1973), 53 Ill.2d 465, 472 (see also *People v. Chupich* (1973), 53 Ill.2d 572). We note, too, the substantial number of other courts which have since reached or adhered to the same conclusion. Illustrative of these are *Irby v. State* (1973), 60 Wis. 2d 311, 210 N.W.2d 755; *United States v. Gilliam* (D.C. Cir. 1973), 484 F.2d 1093; *Reynolds v. State* (1973), 254 Ark. 1007, 497 S.W.2d 275; *Key v. State* (Tex. Crim. App. 1973), 492 S.W.2d 514; *United States v. Gregory* (5th Cir. 1973), 472 F.2d 484; but see *United States v. Collins* (5th Cir. 1973), 478 F.2d 837; *Hutchins v. State* (1972), 229 Ga. 804, 194 S.E.2d 442; *Commonwealth v. Tucker* (1973), 452 Pa. 584, 307 A.2d 245; *Commonwealth v. Thompson* (1972), —— Mass. ——, 286 N.E.2d 333; *State v. Nimrod* (Mo. 1972), 484 S.W.2d 475; *United States v. Briggs* (2d Cir. 1972), 457 F.2d 908; *United States v. LaRose* (6th Cir. 1972), 459 F.2d 361; and *State v. Raffone* (1971), 161 Conn. 117, 285 A.2d 323.

The State vigorously urges, however, that the United States Supreme Court in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, filed approximately 1½ years after our *Collins* opinion, held that defendants are denied fair trials when prior, inconsis-

tent statements offered by them are excluded from use as substantive proof, and that basic fairness requires extending the same right to the State. Had *Chambers* so held, we might well agree that the State was equally entitled. We believe, however, that *Chambers* does not go so far. In that case Chambers was prosecuted for the murder of a policeman; one McDonald had given to defendant's attorneys a written confession to the same murder, which was repudiated by McDonald at a preliminary hearing; in addition he had admitted to three associates that he had fired the fatal shot. The State did not call McDonald as a witness. Chambers did so, established that he had made the sworn out-of-court written confession, had it admitted in evidence and read it to the jury. On cross-examination by the State McDonald testified he had not shot the officer, explained why he made the confession and why he repudiated it and detailed his activities at the time of the crime. Chambers was not permitted to cross-examine McDonald as an adverse witness, nor was he permitted to call as witnesses the three persons to whom McDonald had admitted the killing. The reasons for exclusion were Mississippi's "voucher" rule, pursuant to which the party calling a witness vouches for his credibility and may not impeach his testimony, and the court's ruling that the out-of-court statements were hearsay. The Supreme Court found that McDonald's testimony was quite clearly adverse to Chambers and that the latter's constitutional right to confront and cross-examine the witnesses against him had never been held to depend on whether those witnesses had initially been called by the State or the accused; that, in the circumstances of that case, the "voucher" rule frustrated Chambers' right to defend.

As to the trial court's refusal to permit Chambers to call as witnesses the three persons to whom McDonald had orally admitted the killing, the Supreme Court noted that Mississippi recognized declarations against financial interest as exceptions to the hearsay rule, but did not accord

similar recognition to declarations against penal interest. While not impugning the validity of the distinction in every case, the Supreme Court, noting McDonald's availability for cross-examination, held the guarantees of trustworthiness there present in McDonald's declarations against penal interest were "well within the basic rationale of the exception for declarations against interest," and that the testimony was critical to Chambers' defense. Declaring the absence of any intent to establish new principles of constitutional law, the court held the combination of errors denied Chambers a trial according with due process standards.

We do not agree that *Chambers* creates any new constitutional doctrine. Nor do we find therein any language indicative of an intent to generally expand the type or category of prior, inconsistent statements admissible as substantive proof of the facts in any given case. We accordingly adhere to our conclusion in *Collins*.

While we do not accept the State's suggestion to change the rule as to the use of prior inconsistent statements, we do not believe our rejection of that change requires affirmance of the appellate court judgment. It must be remembered that the fundamental purpose of any trial is the search for truth—truth, in a criminal case, established beyond a reasonable doubt. It is obvious in this record that Mary Ward was determined not to identify defendant as her assailant, and her testimony that she "had her head down" was a means of avoiding the unpleasant alternatives of naming her paramour as the attacker or perjuring herself by saying she did not know. It is apparent from her own testimony that she had been at her friend's home instead of her own because she feared defendant would come looking for her, and that she knew or saw everything else that occurred at her mother's home prior to the blow on the head.

While the trial and appellate courts viewed the testimony as to the conversations at the hospital as

admissible, if at all, only for purposes of impeachment, we believe the doctor's testimony need not be so limited. Dr. Keasling was summoned to the hospital emergency unit for the purpose of treating Mary Ward, whom he had been informed had a gunshot wound; because he thought it was not such a wound and in order "that I might have a better understanding of the wound problem," he inquired of Mary Ward as to what had happened. It was in response to that question that she made the statements testified to by the doctor.

"Statements of a presently existing bodily condition made by a patient to a doctor consulted for treatment are almost universally admitted as evidence of the facts stated ***. Although statements to physicians are not likely to be spontaneous, since they are usually made in response to questions, their reliability is assured by the likelihood that the patient believes that the effectiveness of the treatment he receives may depend largely upon the accuracy of the information he provides the physician. ***

"The exception might be taken one step further to encompass statements made to a physician concerning the cause or the external source of the condition to be treated." McCormick, Handbook of the Law of Evidence 690-691 (2d ed. 1972); see also Annot., 37 A.L.R. 3d 778, 802 (1971); *Jensen v. Elgin, Joliet and Eastern Ry. Co.* (1962), 24 Ill.2d 383, 388.

The rule is "equally applicable whether the case is civil or criminal." (*State v. Orsini* (1967), 155 Conn. 367, 371, 232 A.2d 907, 910.) Under these authorities it is to us clear that Dr. Keasling's testimony was admissible for purposes of substantive proof as an exception to the hearsay rule.

In our opinion the evidence in this case so clearly establishes the guilt of defendant that any error in the admission of Officer Brown's testimony regarding his hospital conversation with Mary Ward was, beyond a reasonable doubt, harmless error. *Chapman v. California*

(1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Gill* (1973), 54 Ill.2d 357, 368.

We accordingly reverse the judgment of the appellate court and affirm the judgment of the trial court as to count VI, charging armed violence. The appellate court, however, was correct in reversing the conviction for battery (*People v. Curry,* 56 Ill.2d 162), and its judgment in that respect is affirmed.

*Affirmed in part and reversed in part.*