THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL DURKIN TAYLOR, Defendant-Appellant.

Fourth District   No. 4—86—0432

Opinion filed March 23, 1987.

Patrick A. Tuite and Mary L. Mikva, both of Chicago, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Charles M. Leonhard, Assistant State's Attorney, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On April 15, 1986, following a jury trial in the circuit court of Champaign County, defendant, Michael Durkin Taylor, was convicted of an aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1)) upon S.A., a female child seven years of age, and the aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(c)(1)) of S.A. and A.B., also a female child seven years of age. The jury acquitted defendant of a charge of aggravated criminal sexual assault of A.B. The court then sentenced defendant to concurrent terms of imprisonment of 25 years for the assault offense and 7 years each for the abuse offenses. Defendant has appealed. We reverse and remand for a new trial.

Defendant contends that the evidence was insufficient to support the verdicts and makes numerous claims of error in support of his request for a new trial. We find the issue of the sufficiency of the evidence to be a close question but hold the evidence to be strong enough to support the verdicts. However, we conclude that an error in the admission of evidence and improprieties in the closing argument of the prosecutor require the grant of a new trial. We will discuss other issues involving claims of error only to the extent that they are likely to again arise at retrial.

■■ In regard to each offense for which defendant was convicted, we will first discuss separately whether the jury could properly have found that charge to have been proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Accusations that a person has committed sexual offenses of the type charged against defendant have been described as being "easily made, hard to be proved, and harder to be defended by the party accused." (*People v. Nunes* (1964), 30 Ill. 2d 143, 146, 195 N.E.2d 706, 707.) Accordingly, the rule has been established that, in order for the proof of guilt to pass muster on review, the testimony of the person making the accusation must be clear and convincing or substantially corroborated. (*Peo-*

*ple v. Morgan* (1977), 69 Ill. 2d 200, 206, 370 N.E.2d 1063, 1066; *People v. Kolden* (1962), 25 Ill. 2d 327, 329, 185 N.E.2d 170, 171.) We find the testimony of the complainants here to fail to meet the clear-and-convincing test but find their testimony to have sufficient substantial corroboration to support the convictions.

Section 12—13(a)(1) of the Criminal Code of 1961 (Code) provides that a person commits criminal sexual assault if he or she "commits an act of sexual penetration by the use of force or threat of force." (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).) By the terms of section 12—14(b)(1) of that Code, such an assault becomes an aggravated one if the accused is 17 years of age or older and the victim is under 13 years of age at the time of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1).) Section 12—12(f) of that Code includes within the definition of the phrase "sexual penetration," "any contact, however slight, between the sex organ of one person" and that of another. (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).) Section 12—16(c)(1) states that aggravated criminal sexual abuse has occurred when an accused, 17 years of age or older, "commits an act of sexual conduct with a victim" under 13 years of age at the time of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(c)(1).) Section 12—12(e) of that Code includes within the definition of "sexual conduct" any act of the accused whereby he or she intentionally or knowingly fondles or touches, "directly or through clothing" a "part of the body of a child under 13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused." Ill. Rev. Stat. 1985, ch. 38, par. 12—12(e).

With the foregoing definitions in mind, we examine the record upon which the three convictions of defendant were based. Most background information is undisputed. During the fall and early winter of 1985, defendant, an adult, was in his first year as a teacher of physical education, coach, and supervisor of recess at the public grade school at Thomasboro in Champaign County. The complainants, S.A. and A.B., were 7-year-old girls attending the second grade at that school and were in a class which defendant taught in the gymnasium of the school from 1:35 p.m. to 2:11 p.m. each day. Defendant had an office on the stage in the gymnasium and the three offenses were alleged to have occurred in the office or on the stage.

The substance of S.A.'s testimony was as follows. After physical education classes, she and her classmates lined up and walked to their next class except when she was "helping" defendant put away gym equipment in his office. Sometimes this caused her to be late for her next class. Once, while A.B., S.A., and another girl, S.K., were present in the office, defendant touched "down in [her] private area."

(Her testimony appeared to indicate that defendant had told the three girls to put a jump rope between their legs and then touched them between the legs in showing them where to put the rope.) On another occasion, the three girls were asked into defendant's office to "look for a blue jay," which S.A. and S.K. did while defendant was "doing stuff" to A.B. (S.A. described "doing stuff" as defendant's pushing A.B. against a door.) On another occasion, defendant pushed S.A. onto a floor mat, told her to pull down her pants and underwear, which she did under threat of being beaten. Defendant then pulled his pants partly down in front and put his "private" in her "private." This hurt and she tried to push him off. She finally kicked him and got up, pulled her pants up halfway and ran to the bathroom.

S.A. further testified to the following. Upon arrival at the bathroom, she checked her "private area" and found it to be wet and bloody. She told nobody about it because defendant had threatened to harm her if she did. On another occasion, defendant had asked her to touch his "private area" with her hand but she refused. She described her "private" as being the area between her legs. Later, she told law-enforcement officers Whitehill, Pope, and Doty about incidents that had happened to her and also talked to Dr. Buetow about those incidents. However, she had not talked about these events to other children or with her classroom teacher. She told the school principal once that defendant had ripped off her necklace, but she said the principal did not believe her.

A.B. testified that she and S.A. were close friends and agreed that they occasionally assisted defendant in putting equipment away after class. A.B. asserted that defendant several times requested them to pull up their shirts, unbutton their pants and pull them down, but they refused. She also said that once defendant pulled her pants down and put his finger inside her "private." She also testified that on another occasion, she and S.A. went to the principal and complained that defendant was requiring them to pull their pants down, but the principal refused to believe them. A.B. stated that on other occasions defendant had touched her between the legs while she had her pants on. On cross-examination, A.B. contended that she and S.A. ran to the principal's office to tell him that defendant was putting his finger into them, but the principal refused to believe them. A.B. described talking to Mr. Pope and Mr. Doty about the incidents that had happened and also telling her mother that she no longer wanted to go to school.

Dr. Kathleen Buetow, a pediatrician at the Carle Clinic in Urbana, was called by the State. She explained that she had devoted a substantial study to matters of child abuse and in the previous six years had

been involved in approximately 100 cases per year. Dr. Buetow testified that on December 19, 1986, she interviewed S.A. in the presence of a caseworker from the Illinois Department of Children and Family Services and a social worker from her clinic. Previously, S.A.'s mother had told the doctor that S.A. had said that her vagina had been penetrated, and she was suffering vulvar pain. Dr. Buetow said she questioned S.A. concerning the episode which S.A.'s mother had described and was careful to avoid leading or suggestive questions. She also said that she supplied S.A. with anatomical dolls to use to illustrate what had happened. According to Dr. Buetow, S.A. said defendant had placed his "you know what" into her vaginal area and placed the dolls into the position she described. S.A. also told how she ran from defendant's office to the bathroom and upon examining herself, found blood on her underwear. Mention was also made by the doctor that S.A. told her of other unsuccessful attempts by defendant to penetrate her vagina. Dr. Buetow stated that from her physical examination of S.A., she found no objective evidence of any penetration of S.A.'s vagina but that the very slight penetration described could have taken place with some bleeding and healed in a few days.

Next, Dr. Buetow described her examination of S.A. and explained that she placed a swab in S.A.'s vaginal area and S.A. spontaneously told her when the swab was penetrating as far as defendant had done. According to Dr. Buetow, S.A. said that point was reached just as the swab was placed at the opening of the vaginal canal. The doctor said that the examination revealed no abnormalities, and she was of the opinion that if S.A. had been penetrated by an adult male penis to the slight extent penetrated by the swab more than three to five days previously, bleeding would have resulted but healing would have taken place by the time of the examination. Thus, Dr. Buetow was not able to determine from her observation of the condition of S.A.'s vagina alone as to whether S.A.'s version of defendant's alleged assault was accurate. However, the doctor found nothing in S.A.'s physical condition which was inconsistent with her story.

The rest of the State's witnesses testified only briefly. Evidence was presented to show the size of the gymnasium and the relation of defendant's office to the gymnasium. Two classmates of the victims stated that defendant did have members of the class aid him in putting away equipment after class and that these people were often late to their next class. Another schoolmate testified she had seen defendant touching S.A. between her legs while they were on the stage. Another said she had seen S.A. in defendant's office with her pants down. A.B.'s mother testified that A.B.'s behavior had changed during the

fall of 1985 and that she had indicated she did not want to go to school. The mother further testified that in December 1985, A.B. told her what defendant was doing to her at school. She said she repeated the incident to school authorities, and a meeting was held on the subject at the school on December 12, 1985, which defendant attended. According to A.B.'s mother, defendant was told at the meeting that children were complaining about his lifting their shirts, having them sit on his lap, and kissing them on the lips and cheek. She described defendant as being virtually "speechless" at the meeting.

William Kuerth, principal of the Thomasboro grade school, was called by the defendant. He denied that either S.A. or A.B. had ever complained to him about defendant. The school janitor and two school cooks testified they had opportunity to observe defendant during the school day and never saw him do anything improper to the children. The music teacher and the homeroom teacher for S.A. and A.B. testified that they did not remember either of those girls ever being late to class after their physical education classes. The president of the local school board testified she had told defendant not to answer any charges at the December 12 meeting. Many teachers and other persons testified as to defendant's good character. In that regard, Mr. Kuerth described defendant as having a reputation at the school and in the community as being law abiding, decent, and moral.

Defendant testified in his own behalf, categorically denying the commission of any of the acts of which he was charged. He stated that he had children help him in putting away the equipment in his office but said that there were no mats in there. He said that he had been surprised by the subjects raised at the December 12 meeting but had been instructed by the school board president not to say anything. Defendant denied kissing any girls or taking them to his office, but acknowledged that he did hug his students.

At the time of trial, S.A. and A.B. were only 8 years old. They were required to testify in a courtroom before court personnel and spectators. We do not know what effect this had on their testimony, but we conclude their testimony was not clear and convincing. They had some difficulty answering the prosecutor's questions, and the prosecutor was required to lead them quite often. Usually these leading questions did not go to the very heart of the testimony, but sometimes the questions did. On one occasion the prosecutor asked S.A. if there was "a time when [defendant] pushed [her] down." This question started the colloquy during which S.A. described how defendant had placed his "private" in her "private." The examiner also asked S.A. if, when she subsequently examined her vaginal area in the bathroom,

that area felt wet, and S.A. answered in the affirmative. Although both S.A. and A.B. stated that the other was present when the offenses were committed against them, neither child's testimony indicated that she was present when the other was being molested, with the exception of S.A.'s testimony that defendant was once "doing stuff" to A.B. That testimony apparently was concerned with the charge, upon which defendant was acquitted, which alleged defendant assaulted A.B.

Despite the weaknesses in the testimony of the complainants, we hold that sufficient substantial corroborative evidence was presented to support the verdict although, as we have indicated, we determine the close nature of that question to require us to examine the defendant's contention of error requiring a new trial very closely. The corroboration in regard to the aggravated criminal sexual abuse charges came from evidence of defendant's *modus operandi*. The corroboration to support the aggravated criminal sexual assault conviction came from both the evidence of defendant's *modus operandi* and from portions of the testimony of Dr. Buetow.

While evidence that an accused has committed other offenses is not admissible to show the propensity of the accused for crime, it is sometimes admissible to show either a common scheme or a *modus operandi* of the accused. (E. Cleary & M. Graham, Illinois Evidence sec. 404.5, at 165 (4th ed. 1984).) As we will explain, testimony here of S.A. that defendant had touched her in her "private" area tended to corroborate the testimony of A.B. that defendant had committed a similar act of abuse against her. Similarly, the testimony of A.B. in that respect tended to corroborate the testimony of S.A. that defendant had abused her. The evidence tended to show a *modus operandi* followed by defendant. All of this testimony also had some probative value in showing that defendant's alleged aggravated criminal sexual assault on S.A. was within defendant's *modus operandi*.

In *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489, the supreme court recognized that in trying a defendant for burglary during which a female in the invaded residence was attacked, the State properly introduced evidence of a similar burglary where the same defendant had also gained entrance in the early morning hours by removing a screen and standing on a refuse basket. The defendant then made a similar attack upon a sleeping female occupant of the residence. In *People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470, the supreme court held that the State had not violated discovery requirements by not informing the defense that it had evidence of certain other, somewhat similar crimes by the defendant. The court concluded

that the offenses were not sufficiently similar to make evidence of the other offense admissible and warned that for such evidence of other offenses to be admissible to prove *modus operandi*, the similarities between the two offenses cannot be features which are common to most such offenses.

In *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251, a rape conviction was affirmed and the court held that evidence of a similar rape committed by the defendant had been properly admitted to show *modus operandi*. Evidence was presented that both rapes had been perpetrated on the same college campus within two blocks of each other and both occurred on Saturday evenings when few students were in the vicinity. In both cases, the rapist had been riding a bicycle, approached the victim with a vulgar remark, dragged the victim to a dark place below the level of the surrounding ground, and after committing the rape, left on the bicycle. Other decisions of the appellate court have made similar holdings. *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608; *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999; see also McCormick, Evidence sec. 190, at 559-60 (3d ed. 1984); Annot., 2 A.L.R.4th 330, 350-51 (1980).

Generally, evidence of a *modus operandi* is introduced in cases of sexual assault or molestation to aid in the proof of the identity of the assailant. However, as Justice Simon stated in *People v. Middleton* (1976), 38 Ill. App. 3d 984, 990, 350 N.E.2d 223, 228, "evidence of a defendant's *modus operandi* may be relevant not only to the issue of who committed a crime but also to the issue of whether a crime was committed at all." There, evidence that a physician had committed similar batteries and deviate sexual assaults on other patients was held to be admissible to prove the charge there involved which was also brought by a patient. See also *People v. Burgin* (1979), 74 Ill. App. 3d 58, 69, 392 N.E.2d 251, 259.

The case of *Middleton* is analogous to the instant case. Here, the *modus operandi* evidence indicated that defendant committed similar acts of abuse against S.A. and A.B. by virtue of a pupil-teacher rather than a physician-patient relationship. The evidence tended to show that he gained even closer access to the girls by having them help put away equipment and that he used this close relationship to deter the girls from reporting his conduct. The evidence also indicated that the acts took place within a relatively short period of time, the fall to early winter of 1985, and that they occurred in the area of his office. While the alleged assault upon S.A. was not a similar act to the alleged abuses, the similarity of circumstances under which it was performed was such that the evidence of the acts of abuse tends to corrob-

orate the evidence of the assault. The acts performed by the defendant in *Middleton* upon his various patients did not constitute exactly the same offense, but the similarity of the circumstances gave them admissibility.

The testimony of Dr. Buetow also afforded some corroboration of S.A.'s testimony that defendant had sexually assaulted her. To determine the extent of that corroboration, we must decide the extent to which Dr. Buetow's testimony repeating S.A.'s statement to her describing the alleged attack was admissible. Defendant's hearsay objection to that testimony was overruled. In permitting the introduction of the testimony, the trial court rejected any theory that the statement was admissible in its entirety under the corroborative-complaint provisions of section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10), because this court has held that section does not permit recitation of the name of the person who committed the act to which complaint is made. (*People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.) Rather, the court relied upon the precedent of *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564, permitting admission, as substantive evidence, of a victim's statement to her treating physician the details of the occurrence in which she was injured.

In *Gant*, a physician testified that while he was treating a victim at a hospital emergency room, the victim told him " 'she was sitting on the couch when a man entered the room behind her, threatened her, and apparently something hit her on the head, and at the same time a gun went off' " (58 Ill. 2d 178, 181, 317 N.E.2d 564, 566-67). The doctor also testified that the victim had told him that she knew her assailant. The doctor had explained in his testimony that he felt he could treat the victim's wounds better if he knew how they had been received. The victim was a very reluctant witness and purported not to have seen what happened but admitted that defendant was her lover. The victim's mother and brother testified that they were present at the occurrence and that defendant had attacked the victim.

In the above case, the supreme court quoted at length from McCormick on Evidence (McCormick, Evidence sec. 292, at 690-91 (2d ed. 1972)), to explain that statements made to a treating physician were likely to be reliable because the patient would believe that the effectiveness of treatment may depend on the accuracy of the information given. The court also indicated that the exception to the hearsay rule permitting a doctor to testify to statements made by the patient included statements concerning the manner in which the injury was received. There, unlike here, the statement of the victim related by the

physician did not include naming of the assailant.

■ Thus, if Dr. Buetow were a treating physician, the precedent of *Gant* clearly justified admitting all of the testimony of the statement of S.A. except the portion naming defendant. However, defendant maintains that Dr. Buetow was not shown to be a treating physician. Suggestion has been made that the recent decision in *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 503 N.E.2d 355, casts some doubt upon whether a difference still exists between the admissibility of hearsay statements made by a patient to a treating physician and those made to an examining one. There, the court held that both types of physicians may rely upon the same types of information given by patients in forming a diagnostic opinion and may testify as to that information in explaining the basis of their opinion. There, the purpose of permitting repetition of the patient's statement is to aid the trier of fact in determining the weight to be given to the opinion. In a case such as the one before us, the repetition of the patient's statement is offered to prove the existence of the facts related in the statement. Under such circumstances, a difference between a treating physician and an examining one may still be significant. In any event, Dr. Buetow testified that S.A.'s mother had informed her that S.A. had complained of vulvar pain and had reported bleeding. In the absence of any substantive information being presented that S.A. went to Dr. Buetow merely for the purpose of examining, the trial court did not abuse its discretion in determining that Dr. Buetow was a treating physician.

The question of the admissibility of the portion of S.A.'s statement which named defendant as the offender is difficult. If it were admissible, it further corroborated S.A.'s testimony. If it were inadmissible, the court committed error which substantially prejudiced defendant. In *Gant*, the patient's statement, which the jury was permitted to consider, did not name the assailant but did identify the assailant as a person known to the patient. As we have indicated, the theory of that court was that statements concerning a cause of injury made to a treating physician are likely to be reliable because they relate to treatment. The latest edition of the text cited by that court states that when communications from the patient concerning "causation enter the realm of *fixing fault* it is unlikely that the patient or the physician regarded them as related to diagnosis or treatment." (Emphasis added.) (McCormick, Evidence sec. 292, at 840 (3d ed. 1984).) Here, the statement of S.A. repeated by Dr. Buetow did fix fault, laying the blame on defendant.

The State calls our attention to the case of *In re Marriage of Theis*

(1984), 121 Ill. App. 3d 1092, 460 N.E.2d 912. There, at a hearing regarding a father's visitation rights, an offer was made of testimony of a treating physician who had examined the three-year-old girl whose custody was in issue and who would have testified that the child told him that her father had been touching her in the vaginal area. The trial court refused the testimony, but the ruling was held on review to be reversible error. The appellate court considered the testimony to come under both the spontaneous-declaration and the statement-to-a-treating-physician exceptions to the hearsay rule. The court drew analogy to *Gant*, but also indicated that greater liberality should be permitted in the introduction of evidence in custody cases than in criminal cases or even those where permanent parental rights are in issue.

■ We are unaware of any criminal case where a physician has been permitted, under the physician-patient exception to the hearsay rule, to repeat a statement made by the patient identifying the assailant. In *United States v. Iron Shell* (8th Cir. 1980), 633 F.2d 77, a physician treating a nine-year-old victim of an alleged rape on an Indian reservation was held to have been properly permitted to relate a statement made to him by the victim describing the occurrence. That court stated "[i]t is important to note that the statements concern *what happened rather than who assaulted* her." (Emphasis added.) (633 F.2d 77, 84; see also *United States v. Nick* (9th Cir. 1979), 604 F.2d 1199.) A leading Illinois text on evidence contends that even the portion of the statement admitted in *Gant*, which pertained to the patient's receiving threats, was beyond the scope of causation and not properly admitted. (E. Cleary & M. Graham, Illinois Evidence sec. 803.8, at 562 (4th ed. 1984).) Although the physician in that case did testify that the patient stated she knew the assailant, the opinion did not focus on the aspect of the statement which was placed before the jury. That portion of the statement did bear on identity, but only slightly. The court deemed the evidence to be so overwhelming that other improperly admitted hearsay in identifying the defendant was harmless error. We conclude that *Gant* is not precedent for admitting evidence of statements made by a victim to her treating physician naming the assailant.

■ Accordingly, we hold that the admission of the portion of S.A.'s statement to Dr. Buetow which named defendant as the assailant was error which bears strongly on our determination to grant a new trial. The other testimony of Dr. Buetow, including S.A.'s statement of what had happened, corroborates S.A.'s testimony. The fact that S.A. related to Dr. Buetow a degree of penetration by her assailant which was consistent with the doctor's medical findings had corroborative value. We now consider the improprieties which we deem to

have taken place in closing argument.

In the opening portion of the State's closing argument, a prosecutor referred to the testimony of the schoolmates of S.A. and A.B. describing defendant's practice of having pupils aid him in putting away equipment after class and mentioning that S.A. and A.B. were among those who did so. The argument then continued in these words:

> "You have also heard that these children have told this story to any number of people for the last five months consistently. To police officers, to Lieutenant Pope, you heard that name, and to Investigator Bob Doty. And you heard his testimony in describing the layout of the gymnasium area. And then [S.A.] recounted it to Dr. Buetow. And *throughout this time they have told the same consistent* story." (Emphasis added.)

The State has contended that the reference to "children" is to the schoolmates of complainants who testified for the State. However, none of them were shown to have talked to police officers Pope or Doty. Significance must also be given to the reference to S.A.'s conversation with Dr. Buetow in the sentence prior to the last reference to the consistence of the stories.

In the defendant's closing argument, his counsel then mentioned that the State often had to lead the complainants in order to get answers, noted that complainants used the same words in describing sexual acts, and mentioned that the complainants had been interviewed by various law-enforcement personnel. Defense counsel then noted that S.A. had made no complaints to the school cooks, the janitor, or to her regular teacher about any sexual assault upon her by defendant and did not even tell her parents until a later date. In rebuttal and in apparent response to the foregoing argument by the defense, the prosecution called attention to the ordeal to which the complainants had been subjected and then asked a rhetorical question as to why a child would "sit down repeatedly with officers and doctors" whom the child would recognize as being able to check on her story "and say [her explanation] over and over again." The prosecutor then stated that the complainants were interviewed to make sure that charges are not brought unless the children are absolutely sure "to make sure they are consistent, *and they were*." (Emphasis added.)

Still later, the prosecution discussed the difficulties that children aged seven and eight have in presenting the details of an offense and said that the complainants had done their best and did not appear to be fabricating a story. The prosecutor then asked the jury to remember that those children were testifying about events which had occurred five or six months earlier and then stated "[t]hey have told a lot of

people. They may not even remember who they have told what, *but they [have] stuck to their story throughout."* (Emphasis added.)

■ The evidence showed that S.A. made a statement to Dr. Buetow which was consistent with her trial testimony. S.A. also testified that she complained of defendant to the principal, Mr. Kuerth, but later testified that the subject of her complaint was that defendant had pulled on her beads. S.A. also testified that she talked to the Thomasboro police chief and law-enforcement officers Pope and Doty, but no evidence was presented as to what she told them. Similarly, evidence was presented that A.B. had talked to the same people, but the substance of those conversations was not revealed. Thus, the prosecution argument, repeated several times, that the complainants had made consistent statements throughout was very inaccurate and prejudicial to defendant. The State has also contended that its argument was invited by the defense and was proper retaliation. We find nothing in the defense argument to justify the continued reference to consistent statements.

■ Defendant was also substantially prejudiced by the prosecutor's reference in closing argument to his silence at the December 12, 1985, meeting at the school which A.B.'s mother had described as being called to discuss complaints that defendant had been lifting female students' shirts, having them sit on his lap, and kissing them. Defendant had testified that he said nothing at the meeting because the president of the school board had told him to remain silent. The prosecutor argued:

> "And he is at that meeting \*\*\*. [Defendant] is invited to explain or comment and declines. \*\*\* [W]ell, Mr. Taylor sat at that meeting for a whole hour \*\*\* but he never said a word \*\*\*. Why would you need to consult with anyone before you said no? Unless you had something to hide? Why wouldn't you walk in there and tell those parents, no, I can put your fears aside, none of this happened. That would be your first instinct, if you didn't do it."

In asserting the impropriety of that portion of the argument, the defendant concentrates upon the constitutional prohibitions upon comment on the silence of an accused in the face of accusations pronounced in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. This is based upon a theory that discovery information indicated that defendant had been warned by the Thomasboro police chief at the December 12, 1985, meeting that he had a right to remain silent. However, in the matters properly before the trial court at the time of the argument, there is no indication that at the time of that

meeting, the defendant had ever been given *Miranda* warnings or had been charged with any offense for which he was on trial. We need not discuss any possible application of *Doyle*, because the argument was improper for a more basic reason. At the time of the December 12 meeting, defendant had not been accused of any of the conduct for which he was on trial. The meeting concerned accusations that he had lifted shirts of girls, had them sit on his lap, and had kissed them.

In *People v. Aughinbaugh* (1967), 36 Ill. 2d 320, 223 N.E.2d 117, evidence was presented that the defendant was placed in a police lineup and was touched by the complaining witness, thus signifying defendant as the perpetrator of the offense. The defendant was shown to have made no response and the prosecutor commented in closing argument that the failure to respond was a tacit admission of guilt. Although the doctrine of *Doyle* had not yet been invoked, the Illinois Supreme Court held that the introduction of the evidence and the comment on the failure of the defendant to respond was error, because the record did not indicate that the defendant then knew he was being charged with the particular crime for which he was being tried. The opinion does not indicate whether the issue was raised in the trial court, but error was held to be reversible by itself. In *People v. Deberry* (1977), 46 Ill. App. 3d 719, 361 N.E.2d 632, we held that a prearrest silence of a defendant upon accusation was inadmissible if the record did not show that he was accused of the crime for which he was on trial. The failure of defendant in this case to respond to accusations for which he is not here charged was also inadmissible and not properly subject to reference in closing argument.

■ The prosecution's reference to a desire on defendant's part to consult with someone before he responded to the charges made at the meeting was also improper because it implied that he wished to consult counsel before speaking. This implication, in turn, might have been improperly interpreted by the jury as an indication of guilt. *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306.

■ Error in oral argument is waived in a criminal case when, as here, it is not raised in the trial court, unless it results in substantial prejudice. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432.) Where, as here, the evidence is close, the question of substantial prejudice must be examined more closely (*People v. Fort* (1958), 14 Ill. 2d 491, 153 N.E.2d 26) and may combine with other errors to require reversal (*People v. Natoli* (1979), 70 Ill. App. 3d 131, 387 N.E.2d 1096). In view of the close question in regard to the sufficiency of the proof here, we hold the combined effect of the prejudicial improprieties in closing argument to constitute plain error within the meaning of Su-

preme Court Rule 615(a) (87 Ill. 2d R. 615(a)), and to require us to notice that error. When we do so and consider the error together with that in admitting the portions of Dr. Buetow's testimony in regard to S.A.'s telling her that defendant was her assailant, we find that fairness requires us to grant defendant a new trial.

■■ One other claim of error needs to be briefly considered. The original charge against defendant was made by indictment, but on April 18, 1986, four days prior to the beginning of trial, the State filed additional counts by way of information. These counts were the only ones charging defendant with the felony of aggravated criminal sexual abuse of A.B. by touching or fondling her crotch or, more particularly, her vaginal area. Section 111—2(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—2(a)) requires that felony charges be brought by information only after a preliminary hearing at which probable cause has been found. No probable cause hearing was held in regard to those charges nor was such a hearing waived. The State contends that any infirmity in those amended charges was cured by section 111—2(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—2(f)), which states that when charges are brought by information or complaint after a preliminary hearing or waiver thereof, "such prosecution may be for all offenses, arising from the same transaction or conduct of a defendant." Ill. Rev. Stat. 1985, ch. 38, par. 111—2(f).

Had the State initiated the instant prosecution by information or complaint, section 111—2(f) would have cured any problem and permitted the subsequent amendments made here. However, the Code of Criminal Procedure of 1963 makes no similar provision to allow amendments to indictments without either a further indictment or a preliminary hearing. Allowing an indictment which arises from a finding of probable cause by a grand jury to be amended in the same way as complaints or informations filed after a court has found probable cause would be supported by logic. It is not supported by the express wording of the statutes.

This may be a possible defect which the State will choose to correct before retrial. We need not decide whether the amended charges were invalid, because the case must go back for a new trial. We see no problem of double jeopardy that would arise from a new charge.

For the reasons stated, we reverse and remand for a new trial.

Reversed and remanded for a new trial.

LUND and KNECHT, JJ., concur.