THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GERALD JACKSON, Defendant-Appellant.

First District (5th Division)   No. 1—87—2418

Opinion filed September 7, 1990.

Michael J. Pelletier, Martin Carlson, and Kenneth F. Berg, all of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Jeanne A. Morrow, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

## INTRODUCTION

Following a jury trial, defendant Gerald Jackson was convicted of aggravated criminal sexual assault and unlawful restraint. After the circuit court sentenced him to 18 years in prison, defendant appealed to this court. Because we have concluded that he was properly convicted of these crimes, we affirm.

## BACKGROUND

On August 29, 1986, defendant was charged by indictment with two counts of aggravated criminal sexual assault. That offense was then defined as follows:

"(b) The accused commits aggravated criminal sexual assault if:

(1) the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1).)

The State alleged that defendant sexually penetrated complainant C.S.[1] by putting his finger and penis into her vagina, he being over 17 years of age and she being under 13 years of age. Defendant was also charged with one count of unlawful restraint. That offense was then defined as follows:

"(a) A person commits the offense of unlawful restraint when he knowingly without legal authority detains another." (Ill. Rev. Stat. 1985, ch. 38, par. 10—3(a).)

The State alleged that defendant knowingly, and without legal authority, detained complainant.

Defendant filed his motion *in limine* on June 26, 1987, stating that he believed the State would seek to introduce the following evidence at trial: testimony as to the details of complainant's statements to her mother W.S., the police, and medical personnel; and testimony by the treating physician about her opinion as to the cause of com-

---

[1] In order to protect the identity of the minor complainant, we shall refer to the child and her mother by their initials rather than by their full names.

plainant's injuries. Defendant prayed that this evidence be excluded.

Defendant's motion was heard that same day. The State argued that it was seeking admission of complainant's statements under the excited utterance exception, also known as the spontaneous declaration exception, to the hearsay rule. The State further argued that the doctor's testimony was admissible under the treating physician exception to the rule against hearsay. The circuit court agreed, ruling that complainant's statements were admissible under the excited utterance exception, and that the doctor's testimony was admissible under the treating physician exception. Accordingly, the circuit court denied defendant's motion *in limine*.

On June 29, 1987, the circuit court conducted a competency hearing regarding complainant. Complainant testified that she was 10 years old, and that she understood the importance of telling the truth. After no argument or cross-examination by defendant, the court found complainant competent to testify. Trial began that same day. We shall set forth the evidence only as it is relevant to the issues properly before us.

The State began its case with complainant's testimony. Complainant testified that she lived with her mother, uncle, and brother on the first floor of a building on the south side of Chicago. Defendant, whom she identified in court, lived in the building's basement. On Sunday, August 3, 1986, complainant was outside playing and came home about 4:30 p.m. Complainant saw her mother on the front porch of their home and asked her for money to buy ice cream. After complainant finished the ice cream, her mother told her to take a bath. Upon complainant's request, her mother allowed her to take a shower. The only shower the family had was in the basement. Complainant went into the bedroom and undressed. Before she could get into the shower, defendant—who was naked—came into the bathroom, grabbed her around the stomach, picked her up, and took her into his bedroom. Complainant tried to fight and scream, but defendant had his hand over her mouth. Defendant closed the bathroom and then the bedroom doors. Defendant placed complainant down upon his bed, which was pushed up against the wall, and put his finger into her vagina, moving it around. Defendant next put his penis into complainant's vagina, as far as it would go. This hurt complainant, and she experienced a burning sensation. Defendant was unable to put his penis all the way into her vagina, for complainant's mother opened the door at the top of the basement stairs and called her name. Complainant's mother came down the stairs. Defendant lay on top of complainant and pulled the cover over both of them. Defendant's hand was still

over complainant's mouth and she could not escape, as she was pushed up against the wall. After calling complainant's name in the bathroom, her mother came to the door of defendant's bedroom. Her mother called for defendant, but he did not answer. Complainant's mother came into the room. She asked defendant if he had seen complainant, and he replied that she left to go outside early in the morning. Complainant was struggling under the covers during the conversation. Complainant testified that her mother discovered her, pulled the covers back, and grabbed her.

According to complainant, her mother took her upstairs into their bedroom and dressed her. Complainant was crying. After a couple of minutes had passed, when she calmed down somewhat, complainant told her mother what had happened. Her mother turned the television up and called the police. She was taken upstairs to the neighbor's apartment while her mother waited for the police. About five minutes later, her mother brought complainant down to meet a police officer. Although complainant was crying, she was able to tell the officer what occurred. Complainant, her mother, and the officer went to the police station, where the child was questioned by detectives. Complainant was taken to the hospital, where she was examined by a doctor. Complainant testified that she told the doctor what had happened, that her vagina hurt, and that it burned.

Complainant's mother, W.S., also testified for the State. Her testimony is generally consistent with that of her daughter. W.S. testified that she had been widowed approximately five years. W.S. owned a two flat, and she rented out the second floor. Her apartment, located on the first floor, had access to the basement via a stairway. The basement had access to the outside through a backdoor. In August of 1986, W.S. was renting a room in the basement to defendant. There was no lock on the door of the basement bathroom, and the only shower was located there. At about 3:30 p.m. on August 3, she saw defendant pass by her front porch on his bike. When (after searching in vain for her daughter) she later entered defendant's bedroom, he told W.S. that the child had left early that morning. W.S. then discovered complainant under the covers, struggling as if she were trapped and trying to escape. Her daughter was naked, and defendant appeared to be naked also. Complainant was crying. W.S. told defendant that her brother would kill him if he found out what happened, and defendant asked her not to tell her brother. She then took complainant, who was crying and trembling, upstairs. Defendant's bedroom was directly below their bedroom, so W.S. turned up the volume on the television to muffle the sound of her telephone call to the police.

W.S. had a conversation with her daughter. Over defendant's objection, W.S. was permitted to testify that complainant said defendant:

"[S]natched her out of the bathroom, took her to his bed, laid her on the bed, put his finger in her and then she said he put hisself [*sic*] in her."

During this conversation, which occurred approximately three minutes after W.S. rescued her daughter, complainant was still crying and trembling. The police officer arrived about 10 minutes later, and he arrested defendant. Complainant then repeated her story to the officer in the presence of W.S. After her daughter was examined at Wyler's Hospital, they spent the night in LaRabida Hospital. Following their return home from LaRabida, W.S. was allowed to testify over defendant's objection that complainant:

"[H]ad become scared of the house. Every room that I went into she followed me into, even to the bathroom. I would have to go to the bathroom but stand outside of the door with her.

Every night when it was time to go to bed she would pull the drapes tighter ***.

* * *

Every night she would pull the drapes real tight because she said she was scared.

* * *

She was restless. A lot of nights she said it seemed like she heard Jerry breathing.

* * *

I would have to be in every room of the house. Any room that she could go into I would have to go into it or any room I would go into she would follow me. She had become scared of the house."

W.S. testified that her daughter behaved in this manner for approximately two weeks after they returned from LaRabida.

On cross-examination, W.S. admitted that she had known defendant for approximately four years, and that he was a friend of the family. However, she never left defendant alone with complainant. W.S. denied that defendant requested complainant stay out of his bedroom, because he suspected the child of taking money from him. On August 3, when W.S. allowed complainant to take a shower in the basement, she believed defendant was out riding his bike.

Chicago police officer Charles Toles testified for the State. About 5:05 p.m. on August 3, he was assigned to investigate a criminal sexual assault complaint. He arrived at complainant's home at approximately 5:10. After speaking with W.S., he took defendant into cus-

tody. Officer Toles then interviewed complainant in the basement. She was crying and distraught. After about five minutes, he asked her to tell him what happened. Over defendant's objection, Officer Toles testified:

> "[Complainant] told me that she went down into the basement to take a shower on her mother's orders. Her mother told her to go down in the basement and take a shower. She said she went downstairs, went to take a shower.
>
> \* \* \*
>
> She went in and turned the water on. She took her clothes off and at that point the defendant came into the bathroom, picked her up, put his hand over her mouth and carried her into his room.
>
> \* \* \*
>
> \*\*\* [H]e fondled her. He put his finger in her vagina and then he put his penis into her vagina, \*\*\*.
>
> \* \* \*
>
> At which point she heard her mother call her. When her mother called her and there was no reply, her mother came downstairs and found [complainant] under the cover with Gerald Jackson and both were nude, at which point her mother grabbed [complainant] and took her out of the bed and summoned the police."

Officer Toles testified that he heard complainant's version of what had happened from the child before he heard it from W.S. The only question he asked complainant was "What happened?" Complainant told him what had occurred in narrative form, instead of in response to questions.

Dr. Karen Soren, complainant's treating physician, testified for the State. Dr. Soren stated that she was a pediatrician at Wyler's Children's Hospital of the University of Chicago. After questioning Dr. Soren about her qualifications, the State tendered her as an expert in the field of pediatrics and child sexual abuse. There was no cross-examination by defendant on this issue. Dr. Soren testified that she was on duty in the emergency room at Wyler's between 8 and 8:30 p.m. on August 3. She examined complainant at that time. According to Dr. Soren:

> "[Complainant] told me that she had been—well, that an episode occurred at home whereby a man had tried to—had sexually assaulted her basically."

In order to take a medical history, Dr. Soren had a conversation with complainant. Dr. Soren testified:

"[Complainant] told me that she had gotten undressed and was about to take a shower in the basement when the offender snatched her out of the shower—well, she wasn't quite in the shower—snatched her out as she was about to get in the shower, put his hand over her mouth and took her to his room where she said that he touched her all over and that he put his penis into her vagina.

I then asked if he had put his penis into her mouth and she said no. Or into her bottom, her rectum, and she said no."

As our analysis will make clear, it is significant that throughout her testimony Dr. Soren neither repeated complainant's identification of defendant nor referred to him other than as "a man" or "the offender."

The rest of Dr. Soren's testimony may be summarized as follows: Dr. Soren testified that complainant said her vagina hurt. Dr. Soren then examined complainant's body. The results of the examination were normal, apart from complainant's vagina. The vaginal opening was very red and tender. When Dr. Soren retracted the lips of complainant's vagina, its opening measured about one centimeter. Dr. Soren stated that complainant's injuries were less than 24 hours old. Dr. Soren's diagnosis was sexual assault and secondary vaginal irritation. She had complainant admitted to LaRabida as a sexual abuse victim. Based on her findings, her examination, and the history she took, Dr. Soren opined to a reasonable degree of medical certainty that her physical findings were consistent with the story complainant told her. The redness in complainant's vaginal area meant that it was irritated. The fact that her hymen was intact was consistent with her story that there was only slight penetration. Dr. Soren's findings were consistent with a penis being inserted over a short period of time and only slightly penetrating a 10-year-old. A good deal of force, and a long period of time, would be required to fully penetrate a 10-year-old's vagina. A one-centimeter vaginal opening was larger than one would expect a 10-year-old to have, and it was consistent with what the child told her about the offender inserting his finger and then his penis in some slight fashion.

On cross-examination, Dr. Soren conceded that a 10-year-old could possibly have a one-centimeter vaginal opening. It was possible, albeit unlikely, that the opening of complainant's vagina could be inflamed by riding a bicycle or wearing tight clothes. On redirect examination, Dr. Soren stated that redness can be caused by vaginitis, which in turn is caused by poor hygiene or something rubbing against the vagina. But Dr. Soren found no evidence of vaginitis on complainant.

The only reason she gave for her condition was that the offender put his finger and penis into her vagina. Dr. Soren repeated that complainant's injuries were consistent with her story.

After the State rested, and his motion for a directed verdict was denied, defendant testified. Defendant stated that he was 36 years old. He had lived in W.S.' building for four years, paying his rent with food stamps. According to defendant, he helped the family during the last illness of W.S.' husband, and thereafter performed numerous chores around the house. On August 3, he was sleeping at 3:30 p.m. He awoke and helped W.S. make lasagna. After eating, he went back to bed. The next thing he heard was W.S. calling for complainant. After telling W.S. the child was not there, he turned over and saw the naked child standing at the foot of his bed. Defendant panicked and replied to W.S. that her daughter went out the back door. Complainant then jumped over him and got under the covers. Immediately after she hid in his bed, her mother came into the room. He denied asking W.S. not to tell her brother what had happened. Defendant then got up and put on his clothes. He was arrested shortly thereafter. Early in 1986, and frequently thereafter, he told W.S. to keep her daughter out of his room, because he suspected she was taking money from him. Defendant denied raping or molesting complainant, explaining that even if he wanted to there was not enough time.

On cross-examination, defendant admitted that he knew complainant was 10 years old at the time of the incident. Defendant admitted that he did not tell W.S. the truth about where the child was when the former came into his bedroom; he explained that he panicked, complainant panicked, and he was trying to protect her. On redirect, defendant emphasized that the entire incident occurred within a matter of seconds.

Jeffrey Smith, a neighbor, testified as a character witness for defendant. Smith stated that defendant had a good reputation in the community.

After the circuit court denied defendant's motion for a directed verdict, the jury found him guilty of aggravated criminal sexual assault and unlawful restraint on July 1, 1987. On July 29, 1987, defendant filed a motion for a new trial or, in the alternative, a judgment of acquittal. Defendant argued, among other things, that he was not proven guilty of the offenses charged beyond a reasonable doubt; that the circuit court erred in denying his motion *in limine*; and that it erred by overruling his objection to W.S.' testimony concerning complainant's post-incident behavior. At oral argument that same day, defendant stood on his written motion, and the circuit court denied it.

Following the sentencing hearing, the circuit court sentenced him to 18 years in the Department of Corrections for aggravated criminal sexual assault and three years for unlawful restraint, to run concurrently with the 18-year sentence. Defendant filed his notice of appeal on July 30, 1987. In the trial court, he was represented by the Cook County public defender; in this court, private counsel is representing him *pro bono publico*.

## ANALYSIS

On appeal, defendant argues that his unlawful restraint conviction must be vacated because it arose out of the same physical act as the aggravated criminal sexual assault conviction. Additionally, he contends that the circuit court erroneously permitted the State's witnesses to testify to inadmissible hearsay. In particular, he asserts that the following exceptions to the hearsay rule are inapplicable: the corroborative complaint exception, the excited utterance exception, and the treating physician exception. Defendant also maintains that W.S.' testimony about her daughter's post-incident behavior (*e.g.*, that the child had become afraid of the house, etc.) was inadmissible assertive-conduct hearsay, or at least an improper attempt to elicit the jury's sympathy. Finally, defendant urges, he was not convicted of either offense beyond a reasonable doubt.

■ In *People v. Nevitt* (1990), 135 Ill. 2d 423, 448, 553 N.E.2d 368, 377-78, the supreme court stated—as it frequently has—that in order to preserve an issue for review, a defendant must raise it in his post-trial motion; otherwise, in the absence of plain error, the issue is waived. In this case, defendant did not argue in his post-trial motion that the unlawful restraint conviction should be vacated because it arose from the same physical act as the aggravated criminal sexual assault conviction. We find no plain error, as this alleged error neither affected defendant's substantial rights nor denied him a fair trial. (See *Nevitt*, 135 Ill. 2d at 448, 553 N.E.2d at 378.) Additionally, the evidence is not closely balanced. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233, 238.) Thus, the issue is waived. In the absence of waiver, however, defendant could not prevail on this point, for his convictions arose from separate acts: the aggravated criminal sexual assault conviction arose from his sexual penetration of complainant; the unlawful restraint conviction arose from his detention of her. With this in mind, we now turn to the issues properly before us.

THE HEARSAY ISSUE

We need not dwell upon defendant's contention that the testimony

of W.S., Officer Toles, and Dr. Soren exceeded the scope of the corroborative complaint exception to the hearsay rule, whether in its common law or statutory forms. (See Ill. Rev. Stat. 1985, ch. 38, par. 115—10.) The record clearly shows that the admission of their testimony was sought by the State, and allowed by the circuit court, under the excited utterance exception (in the case of W.S. and Officer Toles) and the treating physician exception (in the case of Dr. Soren). Consequently, we shall proceed to consider whether the circuit court abused its discretion in ruling that their testimony was admissible under those exceptions. See *People v. Driver* (1978), 62 Ill. App. 3d 847, 853, 379 N.E.2d 840, 846.

Defendant argues that the circuit court abused its discretion in admitting the testimony of complainant through Officer Toles because complainant's statement was not spontaneous and unreflecting, in that it was initiated by his question "What happened?" Moreover, defendant argues that the lapse of time between the incident and complainant's statements to her mother and Officer Toles gave her time to fabricate a story.

■ In cases involving the alleged sexual abuse of children, a totality of the circumstances approach should be employed to determine whether a particular excited utterance is reliable enough to be admissible; the admissibility of the utterance should be determined on a case-by-case basis, after considering all of the relevant facts. (See *In re Marriage of Ashby* (1990), 193 Ill. App. 3d 366, 374-75, 549 N.E.2d 923, 927-28.) In *Nevitt*, the defendant argued that the trial and appellate courts erred when they found that the three-year-old victim's statement to his mother met the requirements of the excited utterance exception. The statement at issue was made approximately five hours after the alleged incident, and it was made by the victim in response to his mother's questioning. The supreme court rejected defendant's argument, reasoning that the trial court did not abuse its discretion in ruling that the child's statement was reliable. (See *Nevitt*, 135 Ill. 2d at 443-44, 553 N.E.2d at 375-76.) In *People v. White* (1990), 198 Ill. App. 3d 641, 555 N.E.2d 1241, the appellate court discussed at length the applicability of the excited utterance exception in the context of child sexual abuse cases. The court noted that statements made in response to general inquiries as to what occurred may nevertheless be spontaneous. See *White*, 198 Ill. App. 3d at 653, 555 N.E.2d at 1249, citing *People v. Harris* (1985), 134 Ill. App. 3d 705, 480 N.E.2d 1189.

■ In light of these cases, we cannot say that the circuit court abused its discretion in admitting complainant's statements to her

mother and Officer Toles as excited utterances. Complainant's statements were sufficiently reliable to warrant an exception to the hearsay rule. The statements were substantially similar to her own testimony, given in open court, and they were consistent with Dr. Soren's findings. We reject the notion, implicit in defendant's argument, that mechanical application of the facts of particular cases should govern the resolution of such an issue. In other words, it is not decisive that, in a given case, one minute or one hour or one day elapsed between the alleged incident and the statements sought to be admitted. Similarly, it is of little consequence that an utterance may have been prompted by a general question. Rather, the principle that has emerged from the leading authorities is that admissibility is conditioned upon sufficient indicia of reliability. And, in this case, the statements were sufficiently reliable.

■ We must also reject defendant's argument that Dr. Soren's testimony exceeded the scope of the treating physician exception to the hearsay rule. Defendant acknowledges that a leading Illinois case on this question is *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564. In *Gant* the supreme court upheld the admission, for purposes of substantive proof, of the treating physician's testimony that the victim told him " 'she was sitting on the couch when a man entered the room behind her, threatened her, and apparently something hit her on the head, and at the same time a gun went off.' " (58 Ill. 2d at 181, 317 N.E.2d at 566-67.) The doctor also testified that the victim told him she knew her assailant. Defendant also relies upon *People v. Sexton* (1987), 162 Ill. App. 3d 607, 617, 515 N.E.2d 1359, 1366, and *People v. Taylor* (1987), 153 Ill. App. 3d 710, 721, 506 N.E.2d 321, 329. In both cases, the appellate court held that the doctor's repetition of the complainant's identification or naming of the assailant was error.

Here, by way of contrast, Dr. Soren neither repeated complainant's identification of defendant nor named him. As noted above, she referred to him throughout her testimony as "a male" or "the offender." Therefore, *Sexton* and *Taylor* are inapposite. Moreover, Dr. Soren's testimony is no more incriminating than the testimony held to be admissible in *Gant*, so we fail to see how *Gant* is precedent for defendant's contention that the circuit court abused its discretion in admitting her testimony. Indeed, where the complainant's statements are primarily concerned with what happened to her rather than with who assaulted her, courts have favored the admission of the statements under the treating physician exception. (See *People v. Enoch* (1989), 189 Ill. App. 3d 535, 554-56, 545 N.E.2d 429, 443-44, citing *United States v. Iron Shell* (8th Cir. 1980), 633 F.2d 77.) In our case,

complainant's statements to Dr. Soren were primarily concerned with the circumstances of the assault instead of with the assailant's identity. Accordingly, the circuit court did not abuse its discretion in applying the treating physician exception.

▮▮ ▮ Lastly, we come to defendant's theory that W.S.' testimony regarding complainant's post-incident behavior was inadmissible assertive-conduct hearsay. As we see it, however, W.S.' testimony was not truly hearsay. A leading treatise on the law of evidence in this State points out that nonverbal conduct intended as an assertion—nodding, pointing, and the sign language of the mute—may be classified as hearsay, if it was done for the purpose of deliberate communication. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.2, at 572 (5th ed. 1990).) But nonverbal conduct not intended as an assertion should not be classified as hearsay. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.3, at 575 (5th ed. 1990); accord Federal Rule of Evidence 801, 65 F.R.D. 131, 153 (1975).) When a person acts without intending to communicate a belief, veracity is not involved. The principal dangers the hearsay rule is designed to guard against (lack of opportunity to test by cross-examination the actuality and accuracy of perceptions, recollection and recordation, narration, and sincerity) are not implicated. Whatever risk of error remains is more sensibly a factor to be used in evaluating weight and credibility rather than grounds for exclusion. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.3, at 573 (5th ed. 1990).

The distinction between nonverbal conduct intended as an assertion and such conduct not intended as an assertion is illustrated by comparing with the facts of a case cited by defendant to the facts of this case. In *People v. Higgs* (1973), 11 Ill. App. 3d 1032, 298 N.E.2d 283, a police officer testified that when he arrived at the scene of the crime, a person in the crowd gathered there shouted that the deceased's killer was among four men also there. After the defendant was searched, the officer went on to state, several persons attacked the defendant, shouting that he had shot the deceased. The circuit court sustained his objection to the attackers' statements, but allowed the testimony regarding the attack. The appellate court held that this testimony was prejudicial assertive-conduct hearsay that should have been excluded. (See *Higgs*, 11 Ill. App. 3d at 1037, 298 N.E.2d at 287-88.) Clearly the crowd's conduct was nonverbal conduct intended as an assertion, or assertive-conduct hearsay, the intended assertion being that the defendant shot the deceased. Yet here complainant's nonverbal conduct was not intended as an assertion and, therefore, was

not hearsay. Both complainant and her mother believed that the former had been assaulted and that defendant had assaulted her. And both mother and daughter were available for cross-examination on this point if defendant wished to test their veracity.

■ By the same token, we must reject defendant's claim that the admission of the post-incident behavior testimony improperly elicited the jury's sympathy. In support of this proposition, he draws our attention to *People v. Fuelner* (1982), 104 Ill. App. 3d 340, 432 N.E.2d 986, and *People v. Gillman* (1980), 91 Ill. App. 3d 53, 414 N.E.2d 240. But the facts of these two cases are not analogous to the facts of our case. In both cases, the appellate court held that the defendants were prejudiced by the admission of testimony regarding the psychiatric treatment the victims received after the incidents. Here the circuit court properly kept evidence of complainant's subsequent therapy from the jury. We conclude, then, that the circuit court did not abuse its discretion in permitting W.S.' testimony concerning her daughter's post-incident behavior.

Defendant argues that the admission of the foregoing testimony was prejudicial, rather than harmless, error. Because we have determined that the circuit court committed no error, however, we need not reach the question of harmless error.

THE SUFFICIENCY ISSUE

■ In *People v. Eyler* (1990), 133 Ill. 2d 173, 549 N.E.2d 268, the supreme court restated the principles which apply when a defendant claims that the evidence was not sufficient to prove him guilty beyond a reasonable doubt. It is the jury's function to determine guilt or innocence, and a reviewing court shall not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the defendant's guilt. It is not the function of the court of review to retry the defendant. Instead, the relevant question is whether, after viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Ultimately, it is for the jury to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony. See *Eyler*, 133 Ill. 2d at 191-92, 549 N.E.2d at 276, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

■ Applying these principles to our case, we readily conclude that defendant's convictions for aggravated criminal sexual assault and unlawful restraint are not subject to reversal. Complainant's testimony was corroborated by her mother, Officer Toles, and Dr. Soren.

Defendant's arguments about the sufficiency question are, at bottom, attacks on the credibility of the State's witnesses or attempts to create conflicts or inconsistencies in their testimony. Obviously, the jury resolved these matters against defendant, and neither the facts of the case nor our function as a reviewing court justifies overturning their judgment.

Typical of defendant's approach on this issue is the following false dilemma. Defendant notes that Dr. Soren testified that her findings were consistent with only slight penetration, but that complainant testified that defendant inserted his penis into her vagina as far as it would go. Defendant asks, rhetorically, how the physical findings can be consistent with only slight penetration, on the one hand, and with the insertion of the penis as far as it would go, on the other hand? The dilemma is false because defendant's question assumes that there are only two possible explanations for the physical findings, when in fact there are more. That is, "as far as it would go" could very well equal "slight penetration," given that complainant was only 10 years old and defendant 36, and that she testified that her mother called for her immediately after defendant inserted his penis. Similarly, defendant makes much of the fact that, although complainant stated she struggled with defendant, Dr. Soren found no bruises. But it does not strain credulity to observe that a 36-year-old man could subdue a 10-year-old girl without injuring her, in view of the relative differences in their size and strength. Finally, defendant claims that his actions, including not escaping through the backdoor while W.S. was calling and waiting for the police, are those of an innocent man. But we think defendant's actions may also be explained by the fact that W.S. turned up the volume on her television while calling the police, so he did not know they were coming. Without laboring matters unnecessarily, we hold that a rational jury could have found the essential elements of both offenses beyond a reasonable doubt.

CONCLUSION

For the reasons stated, then, we have concluded that defendant was properly convicted of aggravated criminal sexual assault and unlawful restraint.

Affirmed.

LORENZ and MURRAY, JJ., concur.