THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS DEFYN, Defendant-Appellant.

First District (5th Division)   No. 1—88—0308

Opinion filed November 22, 1991.

Rita A. Fry, Public Defender, of Chicago (Konrad Rayford and Kyle Wesendorf, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William Pistorius, and Gigi Ann Gilbert, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Thomas Defyn was found guilty of criminal sexual assault and unlawful restraint and sentenced to 14 years in the Illinois Department of Corrections. We consider: (1) whether the prosecutor made improper comments in closing and rebuttal arguments; (2) whether the trial court erred in preventing the defendant's cross-examination of the victim about her refusal to talk to a defense investigator; (3) whether the trial court coerced a guilty verdict by permitting the jurors to deliberate after they were informed that they would be sequestered; and (4) whether defend-

ant was properly convicted of both criminal sexual assault and unlawful restraint.

At trial, the victim, J.M., testified that on April 7, 1987, while in Chicago on a business trip, she went to Bootleggers, a bar in the Rush Street area. It was there that she met the defendant. After conversing with defendant for approximately 45 minutes, defendant invited J.M. to come back to his apartment. While J.M. hesitated at first, after "making sure that there wasn't anything else defendant was looking for" she accompanied defendant to his apartment.

J.M. testified that once inside defendant's apartment, she took a seat on a small couch, while defendant sat on a larger couch and made some telephone calls. While still on the telephone, defendant motioned for J.M. to come over by him so that he could show her how his calculator worked. Defendant then asked J.M. to give him a kiss, she refused and told him "we already discussed this. You're making me uncomfortable. I'm going to get up and leave." As J.M. attempted to get up from the couch, defendant jumped her, pulled her hair and pushed her back on the couch. Defendant slapped J.M. across the face with his open hand and got on top of her. Defendant then grabbed J.M.'s hand and placed it on his penis. J.M. tried to push defendant off of her but defendant told her to "go ahead keep on fighting." Defendant then looked at J.M. and said, "Yeah, that's right. This is rape." J.M. testified that she continued to fight the defendant, telling him "no."

The defendant then grabbed hold of J.M.'s hair, unzipped his pants, took out his penis and demanded that she perform oral sex. J.M. continued to fight against him as defendant forced her down on his penis. Defendant told her if she did not cooperate, he would strike her. Defendant then put his penis in J.M.'s mouth and shook her head up and down until he ejaculated.

J.M. testified that defendant then demanded that J.M. pull up her skirt and take off her nylons. As she began removing her nylons, defendant pulled them off, and inserted his penis in her vagina from behind. J.M. told defendant again that she wanted to leave but defendant again forced her to perform oral sex. When J.M. resisted, defendant threatened, "I'm going to cold cock you if you don't do this." J.M. complied and defendant then instructed her to insert her fingers into his anus. J.M. complied after again being threatened by defendant.

Defendant paused for a moment and then threw J.M. back on the couch and laid on top of her. J.M. again told defendant that she wanted to leave to which he replied, "No, your [sic] either going to

satisfy me during the next two hours or your [*sic*] going to be here for two more days." Defendant again inserted his penis into J.M.'s vagina while yelling at her to "tell me you know your [*sic*] being raped. Tell me what it feels like to have your body mean nothing." Defendant then got off of J.M. and insisted that she once again insert her fingers into his anus. Defendant then put his mouth on J.M.'s vagina.

J.M. told defendant that she had to go because she had a meeting in the morning. She attempted to get off the couch but defendant forced her to face the wall and he again inserted his penis into her vagina from behind. Defendant then pinned J.M. to the couch. J.M. told defendant that she had a meeting and people were expecting her. Defendant finally let J.M. stand up, put her nylons on and walk to the door.

Defendant followed J.M. out into the hallway and then into the elevator and out the front door onto the street. J.M. yelled for a cab, and when one stopped, defendant followed J.M. to the cab. J.M. told defendant not to do this to another person. Defendant offered J.M. money for the cab, and when she refused, he took the money out of his pocket and threw it at the cab driver. Once the door was shut, J.M. instructed the cab driver to go around the block so that she could get the address of where she came from because she had just been raped. She then went looking for her cousin, David. After leaving a message for David, she went to her hotel and telephoned the police. The police brought J.M. to Resurrection Hospital around midnight where she was examined by Dr. Meyers. The next day, J.M. identified defendant from a lineup.

On cross-examination, J.M. denied that she had used cocaine that evening or had any substance with her. She denied that she was affectionate with defendant in the bar or that they left arm in arm. She denied that she was reading an issue of Playboy magazine while defendant was on the telephone. J.M. conceded that she never screamed for help or looked for a weapon in the apartment. She denied threatening to cry rape because she had been cheated out of cocaine.

Juan Jimenez, the cab driver who picked up J.M. after the incident, testified that on April 7, 1987, he stopped at 1300 North Dearborn, where a man instructed him to take a woman to the airport and handed him $13. Jimenez testified that as he began to drive away, the woman told him to go around the block and get the address of where she came from because she had just been raped. He described J.M. as "very upset" and "in an emotional state."

During cross-examination, Jimenez admitted that J.M. never asked to be taken to a police station or hospital.

Detective Catherine Fitzgibbon testified that on April 8, 1987, she took defendant into custody. While at the police station, defendant stated that he did not understand why J.M. would say he raped her. Fitzgibbon further testified that while interviewing defendant, he never mentioned that J.M. came over to his apartment to get cocaine.

Assistant State's Attorney Woloshin testified that on April 8, 1987, she spoke with defendant at his request. She testified that defendant told her that he met J.M. in a bar and after about 30 minutes they went back to his apartment. After making some phone calls he began kissing J.M. Defendant admitted to Woloshin that he could tell J.M. was not interested in fooling around and that he told the victim that he wanted her to be his sex slave for a week. Defendant stated that he told the victim "this is date rape, I'll tell you what I want you to do." The defendant told her to take her clothes off and she told him that she had just tested positive for AIDS. Defendant told Woloshin that although he now realized that J.M. was saying "do not touch me" at the time he told J.M. that "like the cowboys, I'll die with my boots on." Defendant admitted that he put his penis inside J.M.'s mouth although he could tell that she was not interested in having oral sex with him. Defendant then told Woloshin that J.M. told him that he was terrorizing her. He then took her outside and put her in a cab and she told him not to do this to another girl. Woloshin further testified that defendant never mentioned anything about cocaine during their conversation.

Dr. Meyers testified that he examined J.M. in the emergency room of Resurrection Hospital in the early morning of April 8, 1987. The doctor testified that he observed a bruise on the victim's right forearm and some abrasions on the upper insides of her thighs, close to the opening of her vagina. On cross-examination, Dr. Meyers admitted that he did not observe any cuts, scratches or bruises on the victim's face but on redirect stated that it was not uncommon for a bruise to appear sometime after the injury had occurred. It was stipulated that the vaginal swab taken from J.M. tested positive for the presence of spermatozoa, while the oral swab tested negative.

The defendant testified on his own behalf. He admitted that he had previously pled guilty to an arson charge. He testified that on April 7, 1987, he went to Bootleggers and ordered a drink. As he was blowing his nose, J.M. said to him from across the bar "that is

what cut does to you." Defendant testified that they began a conversation which turned into flirting. He ordered two rounds of shots and then kissed J.M. According to defendant, he told J.M. that he could get her some cocaine and asked her to come back to his apartment and get a hit. As J.M. and the defendant left the bar, defendant testified that he noticed a woman he knew named Susan Grossman. He invited Grossman to do some cocaine with them but she declined. During the walk home, defendant testified that he stopped once and kissed J.M.

Defendant testified that once in his apartment, J.M. took out the last of her cocaine and snorted it on the glass coffee table. She asked defendant if he wanted a line and he joined in. Defendant testified that after snorting the cocaine, he made some telephone calls regarding the purchase of 3½ grams of cocaine. Meanwhile, defendant testified that J.M. was thumbing through his recent issue of Playboy magazine and asked him what pictures he liked. According to defendant, they then began kissing and J.M.'s attitude was "hot and cold." J.M. was aloof and a moment later she was receptive. He did not know "what the heck was going on." Defendant testified that after kissing for about 10 minutes, they engaged in sexual intercourse and oral sex. Defendant testified that he never struck or grabbed J.M. and that he never ordered her to do anything. Defendant testified that she never cried out for help and as far as he was concerned they were having consensual sex.

Defendant testified that J.M. then went back to the table and finished the rest of the cocaine. When the cocaine was gone, J.M. grabbed her clothes and went into the bathroom. Defendant testified that she seemed upset and started to cry. According to defendant, when J.M. came out of the bathroom she called him "Tim." Defendant testified that J.M. then became insistent regarding when the cocaine was going to arrive. He told her he wanted her to leave and she called him an "asshole." J.M. then stormed out of the apartment and defendant followed her because he did not want her to make a scene. J.M. tried to hit defendant and he shoved her into the elevator. He rode down on the elevator with her and she was crying and calling him an asshole as she waved down a cab.

Early the next morning, defendant received a call from the building manager informing him that the police were looking for him. Defendant testified that he knew that J.M. had "weirded out" and had probably said something about the cocaine so he called his attorney. Defendant was taken into custody at his attorney's office.

Defendant denied telling a police officer that he told J.M. that she was going to be his sex slave. Defendant further testified that he had told Assistant State's Attorney Woloshin that the telephone calls at his apartment were for the purpose of obtaining cocaine. Defendant admitted that he lied when he told Woloshin that he did not have vaginal intercourse with J.M. Defendant denied telling J.M. that "this is rape" and her body "means nothing" but he admitted that J.M. was upset and cried during sex.

Susan Grossman next testified on behalf of the defense that while she was at Bootleggers she saw defendant walk over to the bar and buy a drink for a woman sitting at the bar. She testified that she saw defendant and the woman kissing at the bar. As defendant and the woman were leaving the bar, defendant asked Grossman if she wanted to come with them and do drugs, but she declined. She testified that the woman was hanging on defendant's arm and they looked as though they had had a couple of drinks. On cross-examination, Grossman testified that she could not remember what day of the the week this took place but that it was sometime between April 1 and April 10, 1987.

The State then called Officer Stevens as a rebuttal witness. He testified that on April 7, 1987, at approximately 11 p.m. he interviewed J.M. and in his opinion she did not appear to be under the influence of drugs or alcohol. Officer Stevens testified that in the course of his duties as a police officer, he observed thousands of people under the influence of alcohol and drugs and could determine when someone was under the influence.

Following the close of evidence, defendant was found guilty of criminal sexual assault and unlawful restraint. During the sentencing hearing, defendant admitted, "I lied on the stand and committed the act of perjury also. She [referring to J.M.] did no cocaine with me that evening." Defendant was sentenced to 14 years in the Illinois Department of Corrections on the criminal sexual assault charge and three years concurrently for the unlawful restraint offense. Defendant appeals from both his conviction and sentence.

OPINION

■■ We first address defendant's contention that he is entitled to a new trial because of improper comments made by the prosecutor in his closing and rebuttal arguments. Although defendant failed to object to all but one of these allegedly improper comments by the prosecutor and failed to raise the issues in his written motion for a new trial, we will review the comments in order to determine

whether there exists plain error. (*People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103.) Defendant first alleges that the prosecutor improperly argued to the jury that he tried to elude police. Specifically, the prosecutor stated in closing argument:

"[H]e [referring to defendant] is a person who after this all happened while the victim is doing the things that a person [*sic*] was raped was doing, he is doing the things that a rapist would do. What is that; the police are going to be looking for me, I'm not going to be home when they come around.

\* \* \*

You heard the testimony that the police went on a number of occasions to his house. He admitted himself that the first thing that he did when he heard that the police were looking for him was leave home. Why [*sic*] because home is going to be the first place that the police come looking for him and he wasn't there. He acts like someone who is guilty and that tells you something about him."

Defendant cites *People v. Rogers* (1988), 172 Ill. App. 3d 471, 526 N.E.2d 655, in support of his contention that it was improper for the prosecutor to argue that defendant fled from the scene. In *Rogers*, the court held that the prosecutor's comment on defendant's flight was improper since it was not a reasonable inference supported by the evidence. In the instant case, there is nothing improper about the prosecutor's remark that defendant attempted to elude police by leaving home when he learned that the police were looking for him. Defendant testified that when he heard the police were looking for him, he left his home and went to see his attorney because he "knew J.M. had weirded out and said something about coke." The prosecutor's comments on flight were therefore a reasonable inference based on the evidence presented at trial.

■ Defendant also contends that the prosecutor's comment that defendant left home when he heard that the police were looking for him infringed upon defendant's sixth amendment right to counsel by equating the exercise of a constitutional privilege with an admission of guilt. The defendant in *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306, also argued that the prosecutor's closing argument questioned defendant's innocence because he sought assistance of counsel, thereby penalizing defendant for exercising his sixth amendment right to counsel. The prosecutor in *Meredith* stated in closing argument that "he says he talked to these people \* \* \* he called his lawyer \* \* \* I submit he knew he had shot those people that is why he went to call his lawyer in the

morning." The court concluded that the prosecutor's comment on defendant's telephone call to his attorney the morning after the shooting incident was prejudicial error which intended to raise an inference of defendant's guilt from his conduct. The comment equated the exercise of a constitutional privilege with an admission of guilt, thereby penalizing defendant for the exercise of his right to counsel. (*Meredith*, 84 Ill. App. 3d at 1073, 405 N.E.2d at 1311.) The prosecutor's comments in the instant case, however, merely commented on the fact that defendant acted like a guilty person when he left home after learning that the police were looking for him. While the prosecutor did not state that defendant acted like a guilty person by leaving home to consult with his attorney, we do know from the evidence that after defendant left his home, he spent at least some of this time at his attorney's office. As such, we do not find that the prosecutor's comment rises to the level of infringing on defendant's sixth amendment right to counsel, but we do caution prosecutors against injecting such potentially prejudicial comments into their closing arguments.

■ Defendant next maintains that the prosecutor improperly accused him of fabricating a defense. Specifically, defendant complains of the following remarks in the prosecutor's closing argument:

> "Not only do you know that what he said was false, you know it because of what all of the policemen said, and the assistant state's attorney said, things that are totally different, totally different things that were said to them the day he was arrested than what he tried to make up when he got here in court.

* * *

> It's this defendant, and not J.M., who lied to the police, who came in with this cocaine story right up there, ladies and gentleman. Nothing about it to the police, because he just made it up there."

A prosecutor may suggest to a jury that the defendant is a liar provided that the suggestion is based on the evidence or on a reasonable inference drawn from that evidence. (*People v. Jones* (1987), 155 Ill. App. 3d 641, 508 N.E.2d 357.) Here, the prosecutor's statements that defendant lied were supported by ample evidence. Defendant admitted at trial that he had lied to Assistant State's Attorney Woloshin about not having sexual intercourse with J.M. Specifically, defendant admitted that he "didn't tell the truth about being inside her vagina." Furthermore, while defendant testified at

trial that he had told Woloshin that the telephone calls he made from his apartment were for the purpose of obtaining cocaine, Woloshin testified that defendant did not mention anything about cocaine. Accordingly, the record reveals that the prosecutor's comments that defendant lied and made up the cocaine story at trial were based on reasonable inferences from the evidence.

■■ Defendant next contends that the prosecutor improperly aligned himself with the jury by stating:

> "We are not at 1446 Dearborn anymore. We are not on this man's turf under his control or at his mercy *** we are in a court of law."

In support of his argument, defendant cites *People v. Johnson* (1986), 149 Ill. App. 3d 465, 500 N.E.2d 728, where the court found that the prosecutor unfairly aligned himself with the jury by referring to "our job" to find the facts. The *Johnson* court did not, however, assess the prejudicial effect of this particular comment, instead finding that the cumulative impact of the numerous improper prosecutorial comments warranted a reversal. Here, if there was any impropriety in the prosecutor's use of the word "we," this reference was by no means as serious as the prosecutor's improper comment in either *Johnson* or in *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5, where the prosecutor referred to himself as a thirteenth juror. Accordingly, we find that the prosecutor's isolated comment does not constitute reversible error.

■■ Defendant next contends that the prosecutor improperly bolstered the credibility of the police and the assistant State's Attorney who testified at trial. In closing argument, the prosecutor stated:

> "They [the police officers and Assistant State's attorney] can get up there and say oh yes, everything the victim had told us, he told us that. But, they are not going to do that, ladies and gentlemen. They took an oath. If they wanted to lie they could do a better job than that."

A police officer's testimony is to be evaluated in the same manner as that of any other witness, and there is no presumption that such testimony is more credible than that of any other witness. (*People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564.) The cases conflict as to whether it is proper for a prosecutor to comment that police officers would not jeopardize their careers by testifying falsely against the defendant. (See *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659, comparing *People v. Parker* (1979), 72 Ill. App. 3d 679, 391 N.E.2d 89 (improper); *People v. Mayfield*

(1979), 72 Ill. App. 3d 669, 390 N.E.2d 1315 (proper).) Here, we need not resolve this conflict since even if the prosecutor's comment was improper, defendant has not demonstrated that the statement constituted a material factor in defendant's conviction or that the verdict would have been different if the remarks had not been made. *People v. Carter* (1988), 168 Ill. App. 3d 237, 522 N.E.2d 653.

■ The next contention advanced by defendant is that he was denied a fair trial when the trial court prevented him from cross-examining the victim about her reluctance to talk with defense investigators. Specifically, defendant raises issue with the following line of questioning:

"[DEFENSE COUNSEL]: He [the defense investigator] introduced himself to you and asked if you knew who J.M. was didn't he?

J.M.: No. No.

[DEFENSE COUNSEL]: You said you didn't know—

[PROSECUTOR]: Objection.

\* \* \*

[DEFENSE COUNSEL]: Where J.M. was?

[PROSECUTOR]: This is irrelevant.

THE COURT: I'm going to sustain the objection, at this point.

\* \* \*

[DEFENSE COUNSEL]: Did you ever discuss this case with any defense investigators.

[PROSECUTOR]: Objection.

THE COURT: Sustained."

Defendant contends that the prejudicial effect of the court's error was compounded when the trial court allowed the prosecutor to cross-examine Susan Grossman, a defense witness, regarding her reluctance to talk to prosecutors.

The trial court is allowed wide latitude in the cross-examination of witnesses, and a reviewing court may only reverse where there has been a clear abuse of discretion. (*People v. Peter* (1973), 55 Ill. 2d 443, 451, 303 N.E.2d 398.) Prosecution witnesses are not obligated to talk to defense counsel prior to trial, and it is not an abuse of discretion to exclude cross-examination regarding a witness' refusal to talk to defense counsel. (But see *People v. Williams* (1985), 131 Ill. App. 3d 597, 475 N.E.2d 1082 (although a witness has a right to refuse to be interviewed or cooperate with the other side, that refusal can be cross-examined by opposing counsel in or-

der to show bias, hostility, prejudice or interest); *People v. VanZile* (1977), 48 Ill. App. 3d 972, 977-78, 363 N.E.2d 429 (the credibility of a witness is always in issue; therefore, when one is asked to be interviewed on what his testimony will be, he declines at the risk that he may be asked later on at trial about such facts and his reasons therefor).) Accordingly, we find no abuse of discretion on the part of the trial court in refusing to permit the cross-examination of J.M. on her refusal to speak with the defense investigators prior to trial.

■ Defendant next maintains that the trial court coerced a guilty verdict from the jurors by permitting them to deliberate after they had been informed that they were going to be sequestered for the night. After the jury had deliberated for some time, the judge instructed the jurors:

"THE COURT: Ladies and gentleman, because of the hour and because we are under certain constraints, because of our system here, we are going to have to recess at this time for the evening. We have made arrangements for overnight accommodations. I believe transportation is present too. We will take you to a hotel-motel, whatever. I believe it's out in the Western suburbs and they will return you here tomorrow morning at 9:00 o'clock or so and you will be allowed to continue your deliberations, okay. So thank you very, very much. You may retire, at this time."

The jury was allowed, over defense counsel's objections, to continue to deliberate until the bus arrived. In overruling defendant's objection, the court stated:

"They can deliberate until the bus comes to get them. They are all together in one room, all alone. It would be silly to tell them no, you can't talk to each other. It may take 10 or 15 minutes."

The record does not reveal the actual time the jury deliberated before reaching its verdict or the actual time the bus took to arrive.

Simply informing the jury that it will be sequestered is not necessarily coercive in nature. (*People v. Baggett* (1983), 115 Ill. App. 3d 924, 450 N.E.2d 913.) Extremely brief deliberations after a reference to sequestration may, however, invite an inference that the reference to sequestration coerced the jury into rendering a verdict. (*People v. Hanks* (1991), 210 Ill. App. 3d 817, 569 N.E.2d 205; *People v. Branch* (1984), 123 Ill. App. 3d 245, 462 N.E.2d 868.) In determining the propriety of the trial court's comments, the test is whether under the totality of the circumstances the language used

actually interfered with the jury's deliberations and coerced a guilty verdict. *Branch*, 123 Ill. App. 3d at 251, 462 N.E.2d at 873.

The cases cited by defendant are easily distinguishable. In *People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d 760, the court concluded that the reference to sequestration influenced the verdict since the verdict was returned five minutes after the trial court indicated that the jury would be sequestered. In *Branch*, after finding that the jury was deadlocked, the court singled out, in the presence of the entire jury, the one juror who refused to vote guilty. In addition, the judge gave an incomplete deadlock instruction. A guilty verdict was returned 10 minutes later. The court in *Branch* found that the unique circumstances of that case warranted a reversal. See also *People v. Ferro* (1990), 195 Ill. App. 3d 282, 286, 551 N.E.2d 698 (trial court's statement that, "[i]f you are not going to be able to reach a verdict, I am going to house you in a local motel somewhere until this jury does reach a verdict," was coercive in that it conveyed to the jurors that they *must* arrive at a verdict and did not leave the option of returning no verdict if the jurors were unable to arrive at a verdict).

Here, we are unable to ascertain from the record exactly how much time after the sequestration comment the jury deliberated before reaching a verdict. Although the trial court stated that "it may take 10 or 15 minutes," it appears that the trial court was referring to approximately how much time it would take for the bus to arrive, and not how much time the jury actually deliberated. In fact, the record does not reveal how long the bus did take to arrive. Therefore, because the record is unclear, we will not presume that the deliberation time was so brief as to raise the inference that the sequestration coerced the verdict. In addition, the language used by the trial court was not coercive and rather than pressuring the jurors into reaching a verdict merely informed them that they did not have to reach a verdict that night. See *People v. Hanks* (1991), 210 Ill. App. 3d 823, 569 N.E.2d 205 (trial court's reference to sequestration was simple, neutral and not coercive). *People v. Baggett* (1983), 115 Ill. App. 3d 924, 930, 450 N.E.2d 913 (informing the jury that, "in about half an hour we'll have to make overnight arrangements for you" removed rather than created any pressure on the jury to reach a verdict since they were not being pressured to reach an immediate decision).

■ The last contention raised by defendant is that his unlawful restraint conviction must be vacated because it arose out of the same act that formed the basis of his criminal sexual assault. Be-

cause defendant did not raise the issue in his post-trial motion and the alleged error neither affected defendant's substantial rights nor denied him a fair trial, this issue has been waived. (*People v. Jackson* (1990), 203 Ill. App. 3d 1, 560 N.E.2d 1019.) Furthermore, even if defendant had properly preserved this issue for review, he could not have prevailed on the point. While *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, established that a defendant may not be convicted for more than one offense arising out of the same physical act, *King* is inapplicable here, since defendant's convictions for criminal sexual assault and unlawful restraint arose from separate acts. In *People v. Jackson* (1990), 203 Ill. App. 3d 1, 560 N.E.2d 1019, defendant took the victim into his bedroom and sexually assaulted her. When the victim's mother came looking for her, the defendant laid on top of the victim, kept his hand over her mouth and pushed her against the wall so that she would not escape. The court concluded that defendant's convictions for aggravated criminal sexual assault and unlawful restraint were based on separate acts: the aggravated criminal sexual assault conviction arose from his sexual penetration of the victim and the unlawful restraint conviction arose from his detention of her. *Jackson*, 203 Ill. App. 3d at 10, 560 N.E.2d at 1025.

Likewise, the record here reveals that defendant's convictions for criminal sexual assault and unlawful restraint were based on separate acts. The sexual assault arising from his penetration and his unlawful restraint from detaining the victim as she struggled to get away and pleaded with defendant to let her leave his apartment. The victim testified that when she attempted to leave defendant's apartment, he pulled her hair, pushed her onto the couch and got on top of her. After the first act of penetration, she again tried to get up and defendant pulled her back down on the couch and again forced her to have sexual intercourse as he pinned her to the couch. In fact, J.M. testified that every time she attempted to get off the couch, defendant pulled her back down. For these reasons, defendant's convictions for both criminal sexual assault and unlawful restraint are affirmed. See *People v. Key* (1984), 122 Ill. App. 3d 491, 461 N.E.2d 517.

Affirmed.

LORENZ, P.J., and GORDON, J., concur.